IN THE MATTER OF THE PROBATE OF THE ALLEGED
WILL OF WILLIAM HALE, DECEASED.

Argued March 5, 1956—Decided March 26, 1956.

*Mr. Ira D. Dorian* argued the cause for the plaintiffs-appellants Benjamin Hale and Joseph Hale (*Mr. Clarence E. Kremer,* attorney).

*Mr. Albert L. Kessler* argued the cause for the defendant-respondent Dora Hale.

The opinion of the court was delivered by

VANDERBILT, C. J. This is an appeal by the proponents of the last will and testament of William Hale, deceased, from the judgment of the Union County Court setting aside the probate of that document granted by the surrogate, on the ground that the will was not published as required by *N. J. S.* 3*A* :3–2. It is being considered by this court as a result of a certification of the matter on our own motion.

## I.

The paper purporting to be the last will and testament of William Hale, deceased, was dated June 17, 1954, and was offered for probate by his two sons, Benjamin and Joseph Hale, who were named as executors. The will contained the usual attestation clause reciting the statutory requirements and was signed by two subscribing witnesses, Carrie Reuter and Celia Pell. This latter witness, in the initial proceedings before the surrogate, made a sworn deposition that the testator had published and declared the writing to be his

last will and testament and did perform all of the acts recited in the attestation clause. The will was then admitted.

Dora Hale, the decedent's second wife, not the mother of the proponents, then moved on order to show cause to set aside the probate of the will on the ground that it had been procured by the undue influence of the sons exercised upon the decedent during his last illness. After hearings, the trial judge concluded there was no undue influence sufficiently proven. He properly adverted to the rule that motive and opportunity to exercise undue influence were not sufficient in themselves to invalidate a testament, and short of it appearing that the motive was pursued and opportunity was employed so as to destroy the freedom of will and judgment of the testator, the document purporting to be his last will must be upheld, *In re Neuman's Estate*, 133 *N. J. Eq.* 532 (*E. & A.* 1943); *In re Dyer's Will*, 135 *N. J. Eq.* 58, 61 (*E. & A.* 1944); *In re Filo's Estate*, 9 *N. J. Super.* 146 (*App. Div.* 1950). He did, however, find and determine that the proponents had failed to establish that the will was published as required by statute.

Although undue influence is not an issue before us, a recitation of some of the facts relating to the health of the decedent and to his family relationships is in order to understand the significance and the importance of the acts surrounding the execution of the decedent's last will and testament.

The testator was 88 years old at the time of his death on November 5, 1954. Dora Hale was his second wife of some 20 years and was herself 70 years of age. They got along as well as many married couples and there never was any serious trouble between them. It was understood between them both for many years that if the decedent died first the house they lived in was to go to Mrs. Hale. He even made such declarations of his intentions to others.

The decedent knew that Mrs. Hale had an independent income of about $2,000 per year. Just one month before he died, he asked his wife whether $4,000 would be sufficient

for her financial support. He did not indicate whether he was talking of a sum in gross or yearly, but when Mrs. Hale said, "That will be ample," the decedent replied, "Well, that's taken care of."

By the terms of his will Mrs. Hale was given a conditional life estate in the house. If she remarried or moved out of the house during her lifetime her estate in the property would cease, as would the $35 maximum payment to her per month for taxes on the house. The only other bequest to Mrs. Hale was a one-third part of whatever moneys the decedent left in savings accounts after the payment of debts and funeral expenses. No definite reference is made in the record to the exact amount of this bequest. The balance of the estate was to be divided in substantially equal portions between the decedent's two sons.

The decedent was physically debilitated. Prior to his last illness his eyesight was very poor. He could only just about see enlarged objects. Consequently, it was impossible for him to read without the aid of a strong magnifying glass and even then he could not read well. No one appears to have seen the old man do any reading during the last ten months of his life except Benjamin Hale, who said that his father read the propounded paper with the aid of his magnifying glass.

The attending physician who treated the decedent for more than four years prior to death was of the opinion that mentally the decedent was quite normal; that he was not the type of man who might be coerced or influenced by any person; and that even during his extreme physical weakness while in the hospital in June 1954 he was remarkably alert.

In February 1954 the decedents last illness began. It resulted in his confinement to the hospital for ten days in the latter part of June 1954. From all that appears the will in issue was executed just prior to such confinement. Thereafter he grew progressively weaker and was confined to bed in August 1954 until November 5, 1954, the day he died.

Benjamin Hale says that he consulted Louis B. Zavin, his father's attorney, in March or April 1954, about the preparation of a will for his father. This, he says, was done at his father's request. All of the transactions concerning this will were between Benjamin and the lawyer. When the draft was finished it was sent to Benjamin, who claims he took it to his father for approval. When the final will was prepared it was sent to Benjamin, who says he again took it to his father and left it with him for two or three days.

Mr. Zavin never discussed the contents of the will with the decedent. Benjamin Hale told him that his father was too ill to come to the office and that it was not necessary for the lawyer to see the father. Zavin testified that it was Benjamin who suggested a change in the first draft of the will that would make Mrs. Hale's life estate in the decedent's house conditioned upon her actual residence there. Zavin also indicated that no one made any arrangements with him to have the will executed and he did not learn of the execution of the will in his office until the day after it had taken place. His secretary, Carrie Reuter, recalls that Benjamin called her the morning of the day the will was signed and made an appointment to have the will executed in the afternoon.

On the day the will was signed, June 17, 1954, the decedent told his wife that he wanted to go down to his office. She helped him get dressed, but he never said anything to her about his intention to execute a will. Benjamin called for his father and brought him to the attorney's office. When they arrived he said his father had the will in his hand and declared to Mrs. Reuter "we have come to take care of this will." He agrees that the other witness, Mrs. Pell, was not present at that time.

The testimony of the two subscribing witnesses is not without equivocation. Mrs. Reuter, Mr. Zavin's secretary, who officiated at the signing of the will in her employer's absence, indicated that there were four persons present at the signing—the decedent, Mrs. Celia Pell, Benjamin Hale and herself. Her specific testimony with respect to the publication and declaration by the testator follows:

*Direct examination by Mr. Kremer*:

"*    *    *    *    *    *    *    *

Q. Now, did you declare in front of Mr. Hale, did you mention that this was his will? A. No.

Q. What did you say? A. Well, we didn't say anything because he was weak when he came in, and Mr. Hale had the will for two or three weeks. When he came in we just simply signed it.

Q. And didn't you ask Mrs. Pell to be a witness? A. Yes, that I did.

*    *    *    *    *    *    *    *

The Court: Who asked you to sign?

The Witness: Nobody, I was the secretary, and it was my duty when Mr. Zavin was out to do those things."

*Examination by the Court*:

"Q. Who signed the will first? A. Mr. William Hale.   *   *   *

Q. Where were you when you asked Mrs. Pell to sign as a witness? A. Just standing there beside him.

Q. Did he say anything when you asked her; did the deceased say anything? A. You mean, the old gentleman?

Q. Yes. A. No, he was just given the pen and told where to sign; showed the place and that's what he did."

*Cross examination by Mr. Kessler*:

"Q. And was anything said to William Hale about the paper that he was signing being his will? A. No. I just took it for granted that it was his son, and the father knew what it was.

*    *    *    *    *    *    *    *

Q. Did either William Hale or Benjamin Hale say anything when the will was executed? A. No.

Q. Did you tell William Hale that it was his will? A. No.

Q. Did he read it? A. No.

Mr. Kremer: You mean, then?

Q. In your presence? A. No, he didn't; no. He came in to sign the will. That's what he did. He just came in and signed.

Q. Well, did you have any conversation with William Hale at any time in the office or on the 'phone regarding signing a will? A. No.

Q. Was anything at all said while he was present in the office about signing the will? A. No.

Q. What was said to William Hale? A. Well, he knew he was in to sign a paper, and the pen was put in his hand and he signed on the line that was showed him. And that was it.

Q. Was he told what the paper was? A. Not that I can recall."

On being recalled at a hearing held two months later, she testified as follows:

*By the Court*:

"* . * * * * * * *

Q. No, wait a minute, was anything said in your presence and in the presence of the deceased by Mr. Benjamin Hale, asking Mrs. Pell to sign it as a witness to his will? A. No.

Q. Was anything said by you in the presence of the deceased, or Mr. Benjamin Hale, asking Mrs. Pell to sign as a witness? A. Other than what I said on the phone, calling her downstairs.

Q. When she walked into the room where the three of you were proceeding to sign the will, from the time she went into the room till after she completed her signature, was anything said to her by anybody, that this is a will and we want you to sign this will? A. No, because she was so familiar with wills, she was called on numerous occasions to sign a will. She knew a will when she saw it.

The Court: That is not the point, the point is did the deceased know it was a will. That is the reason for the publication. Never mind the reasons why you think, was anything said or not?

The Witness: No, sir."

Mrs. Celia Pell, the other subscribing witness, testified on direct examination as follows:

"Q. Who asked you to sign the will? A. Well, it so happens that I live in the building where the will was drawn up, and I was called down to act as a witness.

* * * * * * * *

The Court: Did the deceased declare that to be his last will and testament?

The Witness: There was no reading of the will in my presence.

The Court: Not reading but did he say 'This is my will and I ask you to be a witness' or words to that effect?

The Witness: No, no words to that effect at all.

The Court: What happened?

The Witness: I was just called down to act as a witness, witness his signature."

*Cross examination by Mr. Kessler*:

"Q. Did anybody say that this paper was being executed as a will? A. No, there was no mention of anything, in my presence.

* * * * * * * *

The Court: When that clause was just read to you 'Signed, sealed, published and declared by the said William Hale, as an for his last

will and testament' and I said to you: 'Is that what happened?' And you said 'Yes'.

The Witness: Well, actually it wasn't read to me. I signed many wills so, I mean, I know.

The Court: We don't mean that it was read to you, but the contents of that paragraph, is that what happened? That is the question I asked you.

The Witness: Well, the contents, that's what happened, yes. I have to answer yes to that.

Mr. Kessler: Did William Hale say that it was his will?

The Witness: No.

\*        \*        \*        \*        \*        \*        \*        \*

Q. Well, did anybody else in William Hale's presence tell you that it was his will? A. No.

\*        \*        \*        \*        \*        \*        \*        \*

Q. Was the will read by William Hale; did he do any reading in your presence? A. No, he did not.

Q. Did anyone tell him that it was a will to be executed by him? A. Not in my presence.

Q. Did he say anything at all while you were present? A. He did not.

Q. Under what circumstances was it executed, what took place when you came into the room? A. When I came into the room William Hale was sitting in a chair, and he looked very, very weak. And he got up—in fact, his son Ben Hale helped him up from the chair so that he could sign the will. But, there weren't any actual words passed that I can remember."

*By the Court:*

"\*        \*        \*        \*        \*        \*        \*        \*

Q. How did you know what you were signing; how did you know you were witnessing the will? A. Because I was told it was a will that I was to witness.

Q. Who told you? A. Well, I don't remember. I guess it was Mrs. Reuter who was his secretary, called me down to act as another witness to the will.

Q. She told you to act as a witness to the will? Where was it; was it in the room where they were? Where you were? A. That's right.

Q. Was the testator there when she told you that? A. That's correct.

Q. How far away from him were you when she told you? A. Well, it couldn't have been more than a few feet.

\*        \*        \*        \*        \*        \*        \*        \*

The Court: Didn't you just say she asked you to witness the will, and he was in the room and you were only a few feet away? Didn't you just tell me that?

The Witness: Well, perhaps she asked me. I think she asked me to witness the will, over the 'phone before I had gotten down to

the room. She might have repeated it again when I came down. I'm not overly certain of the exact words."

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"The Court: Here is the situation: There seem to be some inconsistencies in your testimony. First, I asked you if what that attestation clause states, is that what happened. And you said, 'Yes.' Then later you said that nobody said it was his will; he didn't say it was his will and nobody said it. Then later on you said that this woman Mrs. Reuter, or whoever it was, asked you several feet from where the deceased was, to witness a will. That it was only a few feet away from you, and later on you said several feet.

Later you said 'She called me on the 'phone and when I came down she might have said it in his presence.'

Now, did the testator or somebody ask you to witness a will, in the presence of the deceased or not?

The Witness: She asked me to witness a will in the presence of the deceased.

The Court: Several feet away from him?

The Witness: Yes.

The Court: And what did he say?

The Witness: He didn't say anything."

She, too, was recalled to the stand two months later and testified as follows:

*By the Court:*

"\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Now, was anything said to you by Mr. Hale when you went down there, to the effect, not in the exact words, but to the effect that this is my will and I ask you to sign it as a witness? A. No, it was not.

Q. Or anyone else in his presence, within his hearing or close enough, and in your presence, did anyone say anything to the effect, 'This is my last will, and will you sign it? Will you witness the signature?' A. No, not in his presence.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. When you got down what was said or done, or both? A. I don't believe there were any actual words spoken at all except that I went right along and signed as a witness.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Nothing was said by anybody to you, after you got down there, in the presence of Mr. Hale? I mean the deceased. A. No.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

The Court: \*　\*　\*

Now, five minutes ago you said nothing was said in the room at all. That is the reason we are back here again today.

The Witness: I am sorry.
The Court: Which is correct?
The Witness: This is correct, she called me on the interhouse phone and asked me to come downstairs to act as a witness to a will. Nothing actually was said to me when I was downstairs."

## II.

■ On the evidence we are unable to reach any conclusion other than that where there has been no proper publication of the propounded paper.

■ ■ Our statute setting forth the requirements for a valid will, *N. J. S.* 3*A* :3–2, provides that:

"* * * a will to be valid shall be in writing and signed by the testator, which signature shall be made by the testator, or the making thereof acknowledged by him, and such writing declared to be his last will, in the presence of 2 witnesses present at the same time, who shall subscribe their names thereto, as witnesses, in the presence of the testator."

Unless these elements appear in some form or manner "there is no legal sufficiency to devise, pass or bequeath the estate and property of the owner," *Ludlow v. Ludlow*, 36 *N. J. Eq.* 597, 599 (*E. & A.* 1883). And although on at least one occasion in this State it has been suggested that substantial compliance with the dictates of the statute of wills is all that should be required, our more authoritative appellate tribunals have been averse to the adoption of any such view; *Ludlow v. Ludlow*, 35 *N. J. Eq.* 480, 489 (*Prerog.* 1882), affirmed 36 *N. J. Eq.* 597 (*E. & A.* 1883); *In re Taylor's Estate*, 28 *N. J. Super.* 220 (*App. Div.* 1953). A literal construction of the statute with regard to the formal requisites is demanded, *Den ex dem. Compton v. Mitton*, 12 *N. J. L.* 70 (*Sup. Ct.* 1830); *Ludlow v. Ludlow*, *supra; In re Amsden's Will*, 121 *N. J. Eq.* 571, 574 (*E. & A.* 1937); *In re Johnson's Estate*, 115 *N. J. Eq.* 249 (*Prerog.* 1934); and we have no right to accept anything short of positive proof of conformity with the statutory requirements, *In re Amsden's Will, supra.*

These appropriate words of the Court of Errors and Appeals in *In re Sage's Estate*, 90 *N. J. Eq.* 580, 581 (1919) should serve as a guide:

"The statute concerning wills   *   *   * is unique, in the fact that it stands as one of the few legislative products of an early generation which neither the reforming temper of advancing progress, nor the iconoclastic hand of an all-pervading cacoethes for improvement, has seen proper to disturb.

And so at a comparatively early period in our jurisprudence this landmark of early legislative construction was subjected to judicial review at the hands of the learned Chancellor Zabriskie. Reviewing its provision he said: 'Four things are required: *First*, that the will shall be in writing; *secondly*, that it shall be signed by the testator; *thirdly*, that such signature shall be made by the testator, or the making thereof acknowledged by him in the presence of two witnesses; *fourthly*, that it shall be declared to be his last will in the presence of these witnesses.

'Each and every one of these requisites must exist. They are not in the alternative.' *In re Gertrude R. McElwaine's [Estate]*, 18 *N. J. Eq.* 499."

Throughout the cases the courts and lawyers speak of the "publication" of a will by a testator and as a matter of form most, if not all, formally prepared wills contain a recitation to the effect that the testator "publishes and declares" the document to be his last will. The will before us is no different in this respect. No distinction can be drawn between the two words. The New Jersey Wills Act of March 17, 1713-14 (*Revised Laws of* 1820, *p.* 7) required that a will be "published" by the testator. Our present act originally adopted in 1851 requires that the writing be "declared." Since the change, it has always been regarded that whatever could amount to a publication would satisfy the requirement of declaration, *Mundy v. Mundy*, 15 *N. J. Eq.* 290 (*Prerog.* 1858).

██ Literal compliance with regard to publication means that "in the presence of 2 witnesses present at the same time" there must be some conscious indication by the testator, unmistakable in its import, that the act he is about to perform is, or the act he has performed was, the signing of his last will and testament. The declaration may take the form of an

expression by the testator himself to the required effect; or it may be a statement by the scrivener or some one else acting for the testator in his presence and positively acquiesced in by the testator, that the testator's last will is about to be signed or has been signed by him. In cases of indirect publication it must be under such circumstances as to leave no room for doubt that the testator clearly understood the nature of his act and that he wished the persons to whom it was declared to know that he was executing or had executed his last will.

"It is not necessary that the testator should, by his own words * * * declare the writing to be his last will; this in some cases may be impossible through sickness or bodily infirmity. It may be done in his presence and hearing by another acting for him with his assent. * * * But he must by some word or sign, clearly indicate his recognition of the testamentary act in which he is engaged. * * * The words used in the statute, 'acknowledged' and 'declared', demand an open expression either in words or unmistakable acts; and we have no right to change their obvious meaning, or substitute conjecture for positive proof of conformity to their requirement." *Ludlow v. Ludlow, supra,* 36 *N. J. Eq.* 597, 602 (*E. & A.* 1883).

More recently the Appellate Division has said in *In re DuBois's Estate,* 9 *N. J. Super.* 280, at *page* 285 (1950):

"The publication of a will is legally sufficient when enough is said or done *in the presence and with the knowledge of the testator* to cause the witnesses to understand distinctly that the testator desires them to know that the paper produced is his will which they are to attest as such. Such publication may be accomplished by words, acts, or signs. No precise and specific formality is required." (Emphasis supplied.)

Judge Clapp says "There must be some such communication from the mind of the testator to the mind of the witnesses," 5 *N. J. Practice, sec.* 28, *p.* 78.

The effect of these requirements is to insure knowledge by the testator that his solemn act is a testamentary disposition of his bounty. It forestalls fraud by the living upon the dead; it tends to discourage imposition upon the unwary; and it gives to the person who is being compelled consciously against his will an opportunity to cry out.

Tested against these well known principles the writing before us must be denied probate as not being published or declared according to the strict requirements of the Statute of Wills.

Mrs. Reuter, the law stenographer who typed the document, knew it was a writing that was designed to become the will of the testator, but unfortunately she took much for granted. According to her testimony as a subscribing witness nothing was said in the presence of the testator relative to the act about to be performed. Her testimony even negates that of Benjamin to the effect that his father said "We have come here to take care of this will." She assumed the testator knew he was to sign a paper; the pen was put into his hand and he was shown where to sign. He was not told it was his will and nobody, neither the testator nor any one on his behalf in his presence, asked her to be a witness. She says she knew she was to be a witness because Benjamin called her on the telephone and arranged for the appointment to have his father's will executed; she says it was her duty as secretary to the attorney who prepared the document to do these things when he was out, but that nobody asked her to be a witness.

Mrs. Pell's testimony leaves great doubt as to her reliability as a witness. One thing is certain and obvious from her testimony. As a former law stenographer and sister of the attorney who prepared the will she was acquainted with the procedure surrounding the execution of a will. She had signed as a witness on many occasions and probably had many times typed attestation clauses for wills prepared by her brother. Her insistence that what was stated in the attestation clause did happen, but that nobody in the presence of the testator, not even the testator himself, said anything about the document being his last will and testament indicates a thorough lack of understanding of the meaning and significance of the words "published and declared." In such circumstances the *prima facie* effect of her attestation is destroyed.

A perfect attestation clause is a safeguard against defective memories, unintentionally dulled by the passage of time or deliberately dulled by changes in human relationships giving rise to enmity for the testator or for the persons he makes beneficiaries of his will. But just as a safeguard against these exigencies and evils is necessary, a safeguard must also be available against the effect of an attestation clause, lest it in fact be untrue because of the existence of some fraud or, as here, through lack of understanding of the significance of the admissions made. Thus an attestation clause is but *prima facie* evidence of the facts stated in it which may be overcome by clear and convincing proof to the contrary either from the subscribing witnesses themselves or from facts and circumstances actually incident to the execution. Such proof must be clearly irreconcilable with the recitations of the clause, *In re Wherry*, 131 *N. J. Eq.* 505 (*E. & A.* 1942) ; *In re Taylor's Estate*, 28 *N. J. Super.* 220 (*App. Div.* 1953). Even when bolstered by the sworn deposition of a subscribing witness the best that is created is a strong presumption in favor of due execution which may be rebutted by convincing evidence to the contrary, *Ludlow v. Ludlow*, 36 *N. J. Eq.* 597 (*E. & A.* 1883) ; *In re Beggan's Will*, 68 *N. J. Eq.* 572 (*Prerog.* 1905).

The best that could be deduced from the testimony here is that three witnesses, two of whom were subscribing witnesses and the other of whom as an interested beneficiary and a proponent of the will, stated at least on one occasion each that Mrs. Reuter, one of the subscribing witnesses, in the presence of the testator and standing near him, asked the other subscribing witness to be a witness to a document. It is not at all clear that even then there was any indication that the document was a will of the testator or that he acquiesced in such request or made any positive response other than signing. This is not sufficient. There must be proof that there was some communication from the mind of the testator to the minds of *both* witnesses present at the same time, of the event about to take place, *In re Ferris's Will*, 115 *N. J. Eq.* 115, 117 (*Prerog.* 1934), affirmed 117

N. J. Eq. 20 (E. & A. 1934). We are not satisfied that this was an established fact. It may be thought that this view is unrealistic and fails to appreciate the common understanding of human behavior. To such thought we can but answer that "neither conjecture, inference, or logic will arise to proof as required by the statute," *In re Johnson's Estate, supra,* 115 *N. J. Eq.* 249, 252 (*Prerog.* 1934) and that "these considerations may lend significance to what is looked upon by some as an almost ritualistic complexity in the formalities," *In re Taylor's Estate, supra,* 28 *N. J. Super.* 220, 226 (*App. Div.* 1953).

The judgment setting aside the probate is accordingly affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—None.