210 N.J. Super. 295 (1986)
509 A.2d 797
IN THE MATTER OF THE ESTATE OF CONRAD PETERS, DECEASED.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 1986.
Decided May 15, 1986.
*297 Before Judges KING, SIMPSON and SCALERA.
Robert P. Krenkowitz, Deputy Attorney General argued the cause for appellant, State of New Jersey (W. Cary Edwards, Attorney General, attorney for appellant, James J. Ciancia, Assistant Attorney General, of counsel, Robert P. Krenkowitz, on the brief).
Philip L. Strong argued the cause for respondent, Joseph Skrok (Shelley Reed Logan, on the brief).
The majority opinion of the court was delivered by SCALERA, J.S.C. temporarily assigned.
This case requires us to decide whether a will may be validated where one of the two statutorily required witnesses neglects to append her signature when it was executed.
The State appeals from an order of the trial court admitting to probate a will of the late Conrad Peters. Pursuant to that will, respondent Joseph Skrok became the sole beneficiary of the estate. We reverse and enter judgment denying probate of the document as a will.
Conrad Peters, a German immigrant and a resident of South River in Middlesex County, died on March 28, 1985. He was married on June 8, 1946 to Marie Skrok, nee Gall. Marie was then a widow and had had one child by her first marriage, Joseph Skrok, the respondent. No children were born to the marriage of Conrad and Marie; Conrad did not adopt Joseph Skrok. The identity and location of any next-of-kin of Conrad Peters are unknown except that respondent asserts that "every one" of decedent's relatives predeceased him. Marie Peters died intestate on March 23, 1985 only five days before Conrad died.
On December 30, 1983, fifteen months before he died, Conrad Peters was hospitalized in a ward at Roosevelt Hospital in Edison, suffering from the effects of a stroke which left him physically disabled, but mentally sound. At Marie's request *298 Sophia Gall, (Sophia) her sister, an insurance agent, prepared a will for Conrad and brought it to the hospital for execution; that will devised his entire estate to his wife Marie, but if she predeceased him, the estate was devised to his stepson, Joseph Skrok. Sophia was a notary public and arranged to have two employees of her office come to the hospital to act as witnesses to the execution. Sophia read the will to Conrad and he agreed that it was what he wanted. He allegedly then signed the will in the presence of Sophia, Charles Gall (Sophia's husband) and Marie.
When the will was typed, Sophia included two signature lines for witnesses; under one line was typed the name Mary Elizabeth Gall (Sophia's daughter-in-law), and under the other was typed Kristen Spock, both of whom were employees of Sophia. According to Sophia both witnesses arrived at the hospital after Conrad had signed the will and when the two intended witnesses arrived, she "briefly went over the will again." Sophia then signed the will in the space indicated for the notary. However, neither of the intended witnesses ever actually signed the will. At the hearing only Sophia sought to explain why:
As I say, just because of the emotional aspect of the whole situation, her brother was there, myself and the two girls. There were six of us. The other patients had visitors. It got to be kind of  I don't know how to explain it, just the situation, and the girls were in a hurry to get back to the office, because they had to leave the office.
I honestly think in their minds, when they saw me sign the will, they thought that is why they were there. And we folded up the will, gave it to my sister-in-law. It was just that type of situation.
In her affidavit of June 28, 1985, filed after the court hearing on July 29, 1985, Sophia said that she had neglected to obtain the other witnesses' signatures because she "was affected emotionally" by the testator's appearance from the effects of the stroke.
One of the intended witnesses, Mary Elizabeth Gall, also executed an affidavit (apparently submitted to the Probate Part judge but filed after the hearing on July 29, 1985) which varies from Sophia's testimony with respect to the sequence of events. *299 While Sophia said that Conrad signed before the two witnesses got there, Mary Elizabeth Gall said he signed the will after she arrived:
On December 30, 1983, I went to Roosevelt Hospital, Edison, New Jersey. At that time and place, I heard the said Sophia M. Gall read to Conrad Peters his will. When she asked him thereafter if it was his will, he replied in the affirmative.
I looked on, while Conrad Peters signed his will.
In May 1985 plaintiff Joseph Skrok filed a complaint in the Law Division, Probate Part, seeking to admit to probate the will of Conrad Peters, his stepfather as the contingent beneficiary of testator's estate. The will had already been denied probate by the Middlesex County Surrogate because two witnesses had not signed the document. Plaintiff demanded "judgment permitting a second witness to sign the will, and thereafter admitting it to probate." An order to show cause was issued and the matter was scheduled for hearing. Since decedent's estate would escheat to the State if the will were not accepted for probate, the State moved for summary judgment seeking to defeat the application. N.J.S.A. 3B:5-5.
The hearing consisted of briefs, oral argument and the testimony of Sophia on July 12, 1985. The Probate Part judge then rendered an oral opinion admitting the will to probate upon the condition that one of the other witnesses sign the will and execute an affidavit attesting to her presence at the time of execution. An order to this effect was entered accordingly on July 29, 1985. Thereafter, plaintiff refiled a complaint in the surrogate's court, along with the affidavit from one of the non-signing witnesses and obtained letters testamentary on September 3, 1985.
The State contends that the trial judge erred in granting probate because the will was not executed in accordance with the statutory requirements relating to execution of wills and that the decision was motivated solely by a desire to avoid an escheat to the State. Respondent, as the sole beneficiary under the will, if validated, argues that the statutory requirements *300 were met and, in the alternative, urges that the events which occurred were in substantial compliance with the applicable statutory requirements and the will is therefore valid.
The trial court reasoned that the proffered will "was properly executed" because it was acknowledged and signed by the testator in the presence of two witnesses, who were in his presence and of each other. It found that Sophia, the notary public, could be considered a subscribing witness and that probate should be effected just as if one of two witnesses were dead and the will proved by the testimony of a surviving witness. He determined that the failure of the intended witnesses to subscribe the will could be ignored as a mere "quirk" which should not be allowed to frustrate the obvious testamentary intent of the decedent. The alternative would be an escheat to the State and the court had "equitable powers" to avoid what it perceived to be a miscarriage of justice if that occurred. However, the trial court said it was avoiding making a conclusion of law or "universal rule" on the issue of whether such a will could be admitted to probate or a witness allowed to subscribe a will after the death of the testator; rather it limited its ruling to "this particular case."
The relevant section of the Probate Code provides,
Except as provided in N.J.S. 3B:3-3 [holographic wills], every will shall be in writing, signed by the testator or in his name by some other person in his presence and at his direction, and shall be signed by at least two persons each of whom witnessed either the signing or the testator's acknowledgment of the signature or of the will. [N.J.S.A. 3B:3-2].
Concededly, this statute differs from its predecessor in several material respects. For example, it no longer requires that the witnesses sign in the presence of the testator or each other. In re Fernandez, 173 N.J. Super. 240, 245-246 (Law Div. 1980). It is modeled on the Uniform Probate Code (U.P.C.). 5 N.J. Practice (Clapp, Wills and Administration) (Rev. 3 ed. 1982), § 41 at 173. Cf. Matter of Estate of Cosman, 193 N.J. Super. 664, 670 (App.Div. 1984); In re Fernandez, 173 N.J. Super. at 245-246. The comment to U.P.C. § 2-502, which *301 is virtually identical to N.J.S.A. 3B:3-2, reads in pertinent part as follows:
The formalities for execution of a witnessed will have been reduced to a minimum. Execution under this section normally would be accomplished by signature of the testator and of two witnesses; each of the persons signing as witnesses must "witness" any of the following: the signing of the will by the testator, an acknowledgment by the testator that the signature is his, or an acknowledgment by the testator that the document is his will.... There is no requirement that the testator publish the document as his will, or that he request the witnesses to sign, or that the witnesses sign in the presence of the testator or of each other.... The intent is to validate wills which meet the minimal formalities of the statute.
The salutary goal of reducing such formalities has been judicially acknowledged in In re Fernandez, 173 N.J. Super. at 245 ("[t]he new statute relaxes the requirements of the former statute."), and in In re Estate of Cunningham, 198 N.J. Super. 484, 487 (Law Div. 1984) (the new act reduces "... to a minimum the formalities for execution of a witnessed will, ...").
However, respondent would have us construe the "relaxed" standards of the new act to such an extent that a court would possess the power to cure any statutory defects if the "equities" call for a decision to support the will's validity. Included would be the remedy fashioned in this case of allowing a non-signing witness to attest orally to the execution of the will after the testator's death. He relies heavily on the new statute's deletion of the former requirement that the witnesses sign in the testator's presence, reasoning that had the Legislature wanted to place restrictions on when witnesses' signatures were required, it could have done so easily by appropriate language.
Before the 1978 revision it was well-established that the formalities of execution demanded by statute had to be complied with strictly. In re Hale's Will, 21 N.J. 284, 295 (1956). This strict-construction rule applied to the witnessing of a will, such that the statute had to be exactly adhered to for the will to be valid. In re Baker's Will, 68 N.J. Super. 574, 588 (App.Div. 1961). See generally 2 Page, Wills (Bowe-Parker ed. 1960), § 19.75 at 174. The reason for such a rigid approach was the *302 desire to prevent fraud. Murray v. Lewis, 94 N.J. Eq. 681, 684 (Ch. 1923). Thus, evidence that a testator intended the disputed document to be a will was not relevant if the precise statutory steps were not followed:
... A writing may express clearly the wish or intention of a decedent, but if the statutory formalities have not been followed, it is not a valid will, because it cannot be a question of what he intended to do, but whether he has actually followed the provisions of the statute. These provisions are reasonable and easily understood and their purpose is to prevent frauds. An honest attempt to execute a will is occasionally defeated by failure to follow the statute, but it is better that this should happen than that the provisions designed to protect testators generally from fraudulent alterations of testamentary bequests and devises, should be weakened. [Ibid.]
In a marked departure from that overly rigid rule, the trial judge here essentially sought a result based on what he perceived to be an equitable result. First, he found that it was uncontested that the will accurately stated testator's wishes at that time that his property go to his wife, Marie Peters, or to respondent if his wife predeceased him. Second, the judge ruled that Sophia, who signed as notary, should be considered a witness. This finding appears to be supported by case law holding that a notary can be a witness if she can verify that testator signed the will. See, e.g., Matter of Estate of Martinez, 99 N.M. 809, 664 P.2d 1007, 1013 (N.M.Ct.App. 1983). Accord, 5 N.J. Practice, supra, § 50 at 191. Third, he declared himself possessed of "equitable powers" to avoid the "miscarriage of justice" which would occur if testator's intent to devise his estate contingently to respondent was barred by a "mere technicality" of the absence of a second witness' signature. In justifying his exercise of such equitable powers, he invoked the principle that "the law abhors forfeiture" or, in this case, escheat. Fourth, the judge noted that if the testator had handwritten the will, it would have been admitted as a holographic will, and the absence of witnesses' signatures would have been no barrier. Finally, he drew an "analogy" to the situation where "I have one witness who is dead and I have another witness who would come in here and testify to or swear that is the proper signature."
*303 As a solution therefore, the judge devised the following remedy:
... I will permit one or both of those two witnesses to sign the will with an attached affidavit that they were present, in the presence of each other, when the form was accomplished and that they witnessed the signatures of Mrs. Gall, Sophia M. Gall, and that they were there when Mr. Peters acknowledged it to be his last will and testament and his signature.
However, as previously indicated, a court may not employ equity to excuse a failure to comply with the formalities demanded by the Wills Act. The 1978 Amendment under consideration did not change the law in this respect. Thus, in a 1984 case, Cosman, 193 N.J. Super. 664, Judge McElroy disapproved of the trial court's resort to equitable considerations where to do so would contravene the language and intent of the provisions of the probate code governing contracts to make a will. Id. at 669-671. "Were we to enforce such [equitable] principles we would nullify the clear purpose of the statute." Id. at 671. Further, Judge Clapp in his work, has observed that equity will not be applied in disregard of the Wills Act and will not "furnish relief for failure to comply with its terms." 5 N.J. Practice, supra, § 41 at 175-176. Thus, in Watkins v. Watkins, 82 N.J. Eq. 483 (Ch. 1913), aff'd o.b. 85 N.J. Eq. 217 (E & A 1915), a wife defended against her deceased husband's estate's action to partition real estate, arguing that in a prenuptial agreement her husband had agreed to leave his entire estate to his wife by will. The husband had attempted to execute a will, but the court refused to accept it because it was not executed in strict conformity with the statute. In language which we think continues to be pertinent to the present act, the Vice-Chancellor termed the statutory breach an infirmity of substance, not of "mere form." Id. 82 N.J. Eq. at 484.
... In prescribing the manner in which a will must be executed our statute declares the essential elements of a will; in the absence of these essential elements the instrument is not a will. The jurisdiction of a court of equity to aid the defective execution of powers has never been extended to supply more than formal defects as distinguished from defects of substance, and has been uniformly limited in its application to requirements created by private parties; defects arising from the omissions of statutory requirements have never *304 been regarded as falling within that jurisdiction, for courts of equity cannot dispense with regulations prescribed by statute. 2 Pom.Eq.Jur. §§ 589, 590, 834; 1 Story Eq.Jur. (13th ed.) 101 § 96. I find no authority which justifies the exercise of the branch of equity jurisdiction here invoked in aid of the provisions of a will or other instrument which has not been executed in accordance with the positive requirements of a statute. After the enactment of the statute of 1 Vict. c. 26 § 10, prescribing the necessary ceremonies for the execution of wills, the court of chancery of England no longer assumed to aid the defective execution of powers by wills which had not been executed in conformity to the requirements of that statute. [Id. at 485; emphasis supplied].
We believe that Watkins is still efficacious and that failure to execute a will pursuant to minimum statutory requirements has substantive impact. While the 1978 revision lessened the formalities required to execute a will successfully, it does not suggest any substantial relaxation of those which remain.
Support for this approach is found in cases which are factually and legally similar to the case before us. In In re Estate of Flicker, 215 Neb. 495, 339 N.W.2d 914 (1983), a testator had signed his will in the presence of the requisite two witnesses, but the witnesses did not sign it until about three months after testator's death. Nebraska's statutory provision was substantially the same as N.J.S.A. 3B:3-2 and U.P.C. § 2-502. The Supreme Court of Nebraska conceded that the statute did not expressly demand that witnesses sign before testator's death, and that "a respectable argument" could be made that the statute could be satisfied by signing even after death, noting that the intent of the statute was to validate wills meeting the "minimal formalities of the statute." 339 N.W.2d at 915.
Nonetheless, the court refused to read the statute in such a way as to defeat the purpose of having witnesses:
... [W]e construe § 30-2327 to require that the witnesses to a will must sign it before the testator's death. A line must be drawn, and we believe that it is unreasonable to follow the alternative of permitting witnesses to sign a will at any time after the testator's death and prior to the 3-year statute of limitations for probate or testacy proceedings in Neb. Rev. Stat. § 30-2408 (Reissue 1979). As a practical matter, we can think of no good reason for a delay in signing by witnesses until after the testator's death. Permitting witnesses to sign a will after the death of a testator would erode the efficacy of the witnessing requirement as a safeguard against fraud or mistake. We must bear in mind that we are dealing with an instrument allegedly signed or acknowledged by a *305 man who is now dead. He is not present to confirm or reject it. Requiring completion of formalities of execution prior to death is likely to minimize miscarriages of justice. [Ibid.; emphasis supplied].
The Flicker rationale was adopted by the Michigan Court of Appeals in Matter of Estate of Mikeska, 140 Mich. App. 116, 362 N.W.2d 906 (1985), in which proponents offered for probate a will unsigned by any of the witnesses allegedly present at testator's signing. They argued that because the statute (similar to New Jersey's) did not fix a time limit on witnesses' signing, they should be permitted to sign it before the court. While the court noted that the statute permitted a witness to sign after execution, "... it is quite another matter to allow such after [testator's] death." 362 N.W.2d at 911. It restated and relied on the Flicker court's reasoning notwithstanding its acknowledgement that the new probate code was intended "to reduce will formalities to a minimum." Id. at 910. Accord, Rogers v. Rogers, 71 Or. App. 133, 691 P.2d 114 (1984), certif. den. 298 Or. 704, 695 P.2d 1371 (1985) where under a statute requiring the witnesses merely to attest to the will by signing their names, the court refused to admit the will to probate where one witness signed after the testator's death. It stated: "[i]f the requirements of execution have not been met at the time of the death of the testator, then the will is not valid and the purported testator has died intestate."
We see no need to adopt a hard and fast rule at this time, requiring subscription by the witnesses before the death of a testator who may have duly subscribed to the will or acknowledged his signature to the witnesses as required by the statute. Thus, we leave to another day whether a witness' signature on a will moments after a testator has signed and experiences sudden death satisfies the elements of a valid will contrary to the rigid approach of the courts in Flicker, Mikeska and Rogers that the witness' signature must be appended before the testator's death. Similarly, we recognize that subscription by a witness after the testator has duly subscribed or acknowledged but before his death under certain circumstances may likewise compel a conclusion that a will should be declared *306 to have been validly executed. Our view in this case, however, is simply that the evidence, in light of the plain statutory requisites, cannot support the conclusion reached by the trial judge  and this whether we apply principles of equity or the doctrine of substantial compliance.
The statutory mandate that witnesses sign the will would be seriously undermined if not emasculated entirely if the witnesses were permitted here to substitute oral testimony for their written signatures. Had the Legislature desired to do away with the requirement that a witness actually sign the will, it could easily have inserted language to that effect as it did expressly in the provision relating to holographic wills. N.J.S.A. 3B:3-3. The inescapable conclusion is that the Legislature intended that a witness' signature on a will is mandatory where the scrivener is someone other than the testator. To find otherwise would increase the opportunity for fraud, which even the new statute was designed to avoid. However, respondent stresses that there has been no allegation of fraud here. That is true, but it is not a contestant's burden to prove or even allege actual fraud where the minimum formalities of execution are not met in a particular case. In re Blake's Will, 21 N.J. 50 (1956). Additionally, the statute is designed to prevent fraud generally, as opposed to a scheme where the court may give consideration to each individual case.
Moreover, the status of the evidence in this record serves to bolster our conclusion that no valid will resulted. As previously observed, the affidavit of one of the intended witnesses, Mary Elizabeth Gall, directly contradicted the testimony of Sophia as to the sequence of events at the hospital concerning when Conrad Peters signed the instrument. Only Sophia offered a "reason" why the will was not then signed by the intended witnesses. Additionally, she testified that Marie had requested that she prepare wills for both the decedent and Marie. Yet Marie died intestate some fifteen months later and only days before decedent. Finally, the record is barren regarding what occurred during the fifteen month period between *307 the time that the will was attempted to be executed and the time of Conrad Peters' death. No evidence was offered about his state of health during that period, the status of the relationship between decedent and his stepson during that time, and other information which might bear on ascertainment of the decedent's intent or attitude about disposition of his estate at the time of his death. One may speculate that he may have knowingly intended an escheat to the State, if his "affection" for respondent had declined. In other words, his stepson may no longer have been the object of his bounty when he died. Thus, it appears clearly that there are relevant and unexplained circumstances in this case justifying a refusal to recognize the instrument as his last will and testament.
As an alternative ground, respondent argues that the will was valid with just one witness' signature, under the doctrine of "substantial compliance." Even though this point was not argued or ruled on below, we deal with it because a respondent may assert on appeal any theory in support of the trial court's holding without having to file a cross-appeal. Chimes v. Oritani Motor Hotel, Inc., 195 N.J. Super. 435, 443 (App.Div. 1984).
Historically, substantial compliance has not been deemed sufficient for execution of a will where precise conformance to the statutory formalities has been required. In re Hale's Will, 21 N.J. at 295. Application of that doctrine to the revised code has not yet been authoritatively resolved. Judge Clapp has opined "... that today [as of 1982] New Jersey courts would hold that substantial compliance with the Wills Act is sufficient." 5 N.J. Practice, supra, § 41 at 175 n. 12. The Law Division expressly deferred on this question in In re Fernandez, 173 N.J. Super. at 245: "... were I to rule that the wills be admitted to probate because of substantial compliance with the Wills Act, I would be breaking new ground, a role more appropriate to appellate courts." (footnote omitted). See Langbein, "Substantial Compliance with the Wills Act," 88 Harv.L.Rev. 489 (1975) (an extended academic discussion urging a wide application of this doctrine). Even if we were *308 inclined to introduce substantial compliance into this area, ordinarily we should defer such a change to the Supreme Court or Legislature. See Namm v. Charles E. Frosst & Co., 178 N.J. Super. 19, 35 (App.Div. 1981).
In any event, we believe that the paucity of evidence precludes application of that doctrine here. We have previously said that among the proper considerations for invocation of that principle are:
... (1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute. [Bernstein v. Bd. of Trust. Teachers' Pen. & Ann., 151 N.J. Super. 71, 76-77 (App.Div. 1977)]
In our judgment, these considerations likewise lead us to conclude that this document should not be judicially validated as a will. The reasons why the witnesses did not subscribe at any time are either lacking or inadequate. For example, Sophia took the trouble to type the witnesses' names on the will and to allow them to take off from work to drive to the hospital but her explanation of "emotional upset" as the reason why the witnesses did not sign is difficult to comprehend or accept, absent further details. Further, there is no evidence relating to the intervening fifteen-month period and why the omission of the signatures was not noticed and rectified during that period. Thus, it appears that the purpose of the statute and the doctrine of substantial compliance to prevent fraud and an inequitable result would not be served here if this will were validated, given the variances in the testimony and the patent lack of evidence noted.
The physical signing of the will by the witnesses is an obvious requirement of the statute. At the very least the signature should be affixed at a time reasonably proximate to the testator's subscription. What constitutes a reasonably proximate time will necessarily depend upon the facts and circumstances of each case viewed against the statutory purposes to be served. Obviously, as the period of time between *309 these acts widens, the reasons offered should be more closely scrutinized. Only a cautions application of equitably motivated relief or the doctrine of substantial compliance should be tolerated in an area of such importance. The right to make a will is purely a statutory right. 5 N.J. Practice, supra, § 31 at 148. The courts should not, therefore, officiously seize any opportunity to thwart the legislative mandate by carving out exceptions to obvious statutory requisites, absent complete and detailed proof. Cf. Langbein, supra. We do not feel that this case is one which permits us to take such license in the name of equity or substantial compliance and avoid the statutorily-imposed escheat because inheritance by a stepson appears to be a more desirable disposition in this particular case. If an "inequitable" result occurs here, it does so because of the provisions of the law of intestate distribution fashioned by our lawmakers. N.J.S.A. 3B:5-4, 5, 9. We feel strongly that only the Legislature should address a change in that regard. In re Blake's Will, 21 N.J. at 57. Cf. Langbein, supra.
Reversed and remanded for entry of a judgment in favor of the State and against the respondent.
SIMPSON, J.A.D., dissenting.
The sole question in this case is whether Conrad Peter's will should be denied probate because only one of four actual witnesses to his signing or acknowledgement thereof signed the will prior to his death. He had been married to Marie Gall Skrok Peters for 37 years when he was hospitalized with a stroke on December 30, 1983. She was a widow with a son, Joseph Skrok, when they were married in 1946. The Peters had no children and the decedent no other living blood relatives. The estimated value of the estate is $60,000. The will left the entire estate to Mrs. Peters, and the contingent beneficiary was "our beloved son, Joseph Skrok." Conrad Peters died at 9:00 p.m. on March 28, 1985. Marie Peters died at 3:50 p.m. on March 23, 1985 or 126 hours before her husband. If Mr. Peters had died six hours earlier, or Mrs. Peters six hours later, *310 Conrad Peters' estate would have passed to Marie Peters and thence to Joseph Skrok by virtue of intestate succession. N.J.S.A. 3B:5-1; N.J.S.A. 3B:5-3; N.J.S.A. 3B:5-4.
In the absence of a lawyer, the will preparation and hospital bedside execution were unfortunate. Sophia Gall, who was an insurance agent, notary public and sister of Mrs. Peters, typed up the will and provided for the signatures of two intended witnesses and "notarization" by herself. The judge described what happened:
I feel that the will was properly executed and signed by the testator. He requested two witnesses, who did observe him, watched him, observed him sign it. They were present together in the same room at the time the testator declared it to be his last will and testament, in his presence, and the presence of each other.
They were requested to sign, but for some reason stated, did not. They were overcome or overcome at the moment, seeing him in the moment from the stroke that he had received.
The Notary Public did, however, have the presence of mind to sign it. I suppose she witnessed it. What she did, is she witnessed the signing of the testator's signature to the instrument.
The majority has noted a conflict in Sophia Gall's testimony and Mary Elizabeth Gall's affidavit as to the sequence of events, but this is of no moment  since this witness either saw the decedent sign or acknowledge his signature, and either such witnessing is sufficient under N.J.S.A. 3B:3-2. The insignificance of this conflict is apparent, since the State did not argue the point and specifically declined Judge Longhi's offer to require the testimony of the other three witnesses to the execution or acknowledgement (only Sophia Gall testified).
No one questions the trial judge's acceptance of Sophia Gall's signature as a "notary" to be one of the two required witnessing signatures. The judge admitted the will to probate on several bases. First, he permitted a post-death second witnessing signature, since N.J.S.A. 3B:3-2 sets no time limit as to when the signing must occur and the former requirement of N.J.S.A. 3B:3-2 that the witnesses sign in the testator's presence no longer obtains. Second, he exercised his equitable powers to avoid the escheat or "forfeiture" that would otherwise *311 occur. Third, he drew an analogy to a situation where "I have one witness who is dead and I have another witness who would come here and testify to or swear that is the proper signature." The majority, on this appeal, reject these reasons to allow probate and suggest many possibilities of fraud unless there is strict construction of the statute and signatures by the witnesses "at a time reasonably proximate to the testator's subscription." In this case, however, the State has conceded that there is no possibility of fraud. That being the actual situation, I see no bar to the post-death signature of one of the witnesses as being "reasonably proximate" to the testator's death in order to prove the will. The intention of the testator is perfectly clear, there is no dispute among family or friends as to inheritance, and my colleagues' reversal of the trial judge's determination is contrary to the philosophy of probate reform in New Jersey.
N.J.S.A. 3B:3-2 is similar to Uniform Probate Code § 2-502. Minimal formalities are required as to witnessing the execution of a will. The Flicker (Nebraska) and Mikeska (Michigan), cases cited by my brethren, required witnessing signatures prior to testators' deaths  but these cases involved family fights as to property succession as distinguishable from escheat or forfeiture to the sovereign. The solution to the problem in this case is not reincarnation of a portion of the old formal requirements of N.J.S.A. 3A:3-2 by judicial addition to the requirements of N.J.S.A. 3B:3-2. I believe that Professor Langbein's suggested "substantial compliance" doctrine is the proper approach to determine whether a specific factual situation constitutes compliance with the reduced requirements for a valid will under N.J.S.A. 3B:3-1 through 12. The basic intent of these sections is to validate the will whenever possible.
Finally, the reference to Namm v. Frosst is inapposite. That case involved pharmaceutical products liability and a suggested abandonment of a well settled principle of law developed and declared by our Supreme Court. The old New Jersey probate cases cited by my colleagues were applicable to ancient common *312 law theories and doctrines that have been rejected by our Legislature in adopting most of the Uniform Probate Code in Title 3B of our New Jersey Statutes Annotated. Our Supreme Court has not yet addressed the question here presented, but the Legislature has developed the modern philosophy applicable to the situation and certainly an intermediate appellate court should implement that philosophy in interpreting an applicable statute. The Legislature's abhorrence of forfeiture or escheat is also evidenced by the last sentence of N.J.S.A. 3B:5-1 which provides that "This section is not to be applied where its application would result in a taking of intestate estate by the State under N.J.S. 3B:5-6." Perhaps Professor Langbein best summed up the approach that should be taken in a case like this in the conclusion to his article at 88 Harvard L.Rev. 531:
The rule of literal compliance with the Wills Act is a snare for the ignorant and the ill-advised, a needless hangover from a time when the law of proof was in its infancy. In the three centuries since the first Wills Act we have developed the means to adjudicate whether formal defects are harmless to the statutory purpose. We are reminded "that legal technicality is a disease, not of the old age, but of the infancy of societies." The rule of literal compliance has outlived whatever utility it may have had. The time for the substantial compliance doctrine has come. [Citations omitted]
I dissent from the majority holding, and would affirm the trial court judgment admitting the will to probate.