IN THE MATTER OF THE ESTATE OF CONRAD
PETERS, DECEASED.

Argued February 18, 1987—Decided June 17, 1987.

264

*Philip L. Strong* argued the cause for appellant, Pauline P. Skrok, Executrix of the Estate of Joseph S. Skrok.

*Robert P. Krenkowitz,* Deputy Attorney General, argued the cause for respondent, State of New Jersey (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

This case requires our determination of whether a will can be admitted to probate despite the fact that it lacked the signatures of two witnesses, as prescribed by the statute, *N.J.S.A.* 3B:3–2, governing the formal requirements for the execution of a will. The Superior Court, Law Division, ordered that the will be probated, despite the absence of the signatures of witnesses; it held that under the circumstances allowing a witness to sign was a proper exercise of its equitable powers. The Appellate Division reversed, ruling that literal compliance with the formal statutory requirements governing the execution of wills was mandated, and that the court had no power to excuse the failure to have the will subscribed by the witnesses as required by the statute. *In re Estate of Peters,* 210 *N.J.Super.* 295 (1986). The case is before this Court on appeal as of right, as a result of the dissent from the decision below. *R.* 2:2–1(a)(2). We affirm the judgment below.

## I.

Joseph Skrok commenced an action in the Middlesex County Surrogate's Court, seeking the admission to probate of a will

executed by Conrad Peters, Skrok's step-father. The will desig-
nated Skrok as an executor. The Surrogate denied admission
to probate of the proffered will for the reason that it did not
bear the signature of two witnesses. This caused the intestacy
of the decedent's estate, there apparently being no next-of-kin
of the decedent. Because the estate in intestacy would escheat
to the State, the trial court directed the State to show cause
why the proffered will should not be admitted to probate. The
State then brought a motion for summary judgment to deny
probate of the proffered will.

The testimony at the hearing on the motion disclosed that
Conrad Peters, the testator, died on March 28, 1985. Prior to
his death, Peters had been married to Marie Peters (formerly
Gall); they had no children during their marriage. Marie
Peters had been married once before, and had one son, Joseph
Skrok, during her previous marriage. Marie Peters died on
March 23, 1985, approximately 126 hours before the testator, so
that at the time of his death Conrad Peters had no surviving
relatives.[1]

The circumstances surrounding the execution of the will are
important. In December 1983, the testator was in the hospital
for treatment following a stroke. While Peters was hospital-

---

[1]*N.J.S.A.* 3B:5–1 provides that "[a]ny person who fails to survive the decedent
by 120 hours is deemed to have predeceased the decedent for purposes of
intestate succession, and the decedent's heirs are determined accordingly."
Under this statute, had Conrad Peters died six hours earlier, he would have
been deemed to have predeceased his wife for purposes of the distribution of
her estate, and her property would have passed by intestacy to her son. *See In
re Estate of Peters, supra*, 210 *N.J.Super.* at 309–10 (dissenting opinion). How-
ever, as is pointed out in respondent's brief, the statute does not cover the
disposition of jointly-held property, nor does it affect the property owned
solely by Conrad Peters. Therefore, as respondent argues, operation of *N.J.S.A.*
3B:5–1 would not have saved Conrad Peters' estate from escheat, because it
would have applied only to Marie Peters' sole property, which, at her death,
constituted three bank accounts with an aggregate balance of $1,900.00. On
August 16, 1985, the Surrogate ordered distributions of Marie Peters' estate as
an intestate estate, which consisted of the three bank accounts. Plaintiff is
objecting to the denial of probate of the will of Conrad Peters.

ized, a will was prepared for his signature by Sophia M. Gall, Peters' sister-in-law. Ms. Gall had prepared an identical will for her sister, Marie Peters. The wills were drawn up at the request of Marie Peters, who apparently had discussed the need for these wills with her husband in mid-December, 1983. Although Conrad Peters was physically disabled as a result of the stroke, he suffered no mental disability; accordingly, his competency to make a will has not been questioned.

The dispositive provisions of the two wills complemented each other. Each provided for the distribution of the entire estate, after payment of debts and funeral expenses, to the surviving spouse. Both appointed the surviving spouse as executor. Additionally, both wills named Joseph Skrok, Marie Peters' son, as the alternate beneficiary and alternate executor.

On December 30, 1983, Sophia Gall came to the testator's hospital room with her husband and Marie Peters. Ms. Gall read the provisions of the will to Mr. Peters; he then assented to it, and signed it. Although Ms. Gall, her husband, and Mrs. Peters were present at the time, none of these individuals signed the will as witnesses. It was the apparent intention of Ms. Gall, who was an insurance agent and notary, to wait for the arrival of two employees from her office, who were to serve as witnesses.

When those two employees, Mary Elizabeth Gall and Kristen Spock, arrived at the hospital, Sophia Gall reviewed the will briefly with the testator, who, in the presence of the two women, again indicated his approval, and acknowledged his signature. Ms. Gall then signed the will as a notary, but neither of the two intended witnesses placed her signature on the will. Ms. Gall folded the will and handed it to Mrs. Peters. Conrad Peters died fifteen months later, on March 28, 1985. At the time of his death the will was still not signed by either of the witnesses.

At the Probate Court proceeding, Ms. Gall testified as to why the two intended witnesses never signed the will:

> As I say, just because of the emotional aspect of the whole situation, my sister-in-law was there, my husband, her brother was there, myself and the two girls. There were six of us. The other patients had visitors. It got to be kind of—I don't known how to explain it, just the situation, and the girls were in a hurry to get back to the office, because they had to leave the office.
>
> I honestly think in their minds, when they saw me sign the will, they thought that is why they were there. And we folded up the will, gave it [to] my sister-in-law. It was just that type of situation.

In an affidavit executed on June 28, 1985, Ms. Gall explained that her failure to obtain the signatures of the two witnesses was the result of her being "affected emotionally by [the testator's] appearance."

According to Sophia and Charles Gall, Conrad Peters signed the instrument in their presence but before the arrival of the intended witnesses. However, an affidavit submitted to the court by Mary Elizabeth Gall on July 29, 1985, alleges that Mary Elizabeth Gall was present while Conrad Peters signed his will, and that she actually observed him as he executed the document. Plaintiff's only explanation for this discrepancy is that the affidavit was executed approximately eighteen months after the ceremony at the hospital. The State, however, does not argue that the contradictory versions raise the possibility of fraud with respect to Conrad Peters' will.

The trial court found that the proffered instrument "was properly executed" because it was signed by the testator in the presence of two individuals, who were in his presence and that of each other. It further found that in such circumstances, the notary could be considered a subscribing witness and the probate action handled just as if one of two witnesses had died and the instrument were being proved by the testimony of the one surviving witness. According to the court, the failure of the intended witnesses to subscribe the instrument could be ignored as a mere "quirk," which should not be allowed to frustrate the obvious testamentary intent of the decedent. Where, as here, the alternative would be an escheat to the State, the trial court found that it had "equitable powers" to avoid what it perceived as a miscarriage of justice. Accordingly, the court ordered that

the second witness, also present at the December 30, 1983, execution ceremony, be permitted to sign the document. Pursuant to this order, Skrok commenced an action in the Surrogate's Court, seeking to have the proffered will, now bearing the additional signature of a witness, admitted to probate in common form. Letters Testamentary were issued to Skrok.

As noted, the Appellate Division reversed the trial court and remanded the case for entry of judgment dismissing the action. *In re Estate of Peters, supra,* 210 *N.J.Super.* at 295. The court held that the Probate Court was without power to cure a will's failure to comply with the statutory formalities; that New Jersey case law indicated that literal compliance with the wills statute was required in order for a will to be valid; and that, in any event, the evidence in this case, which contained significant contradictions and an inadequate explanation for the failure to obtain the witnesses' signatures, did not support application of a "substantial compliance" rule to uphold the will. One judge dissented, taking the position that there was nothing in the statute invalidating post-death signatures by attesting witnesses. Furthermore, according to the dissent, the execution of the will undertaken in this case was in substantial compliance with the statutory requirement, and should therefore be upheld. 210 *N.J.Super.* at 311-12.

## II.

The operative statute governing the validity of the execution of a will is *N.J.S.A.* 3B:3-2. The statute prescribes the formalities necessary for the proper execution of a will. It requires (1) that the will be in writing and (2) that it be signed by the testator (or by someone in his presence and at his direction). It also requires that a will be signed by at least two persons who witnessed either (a) the signing or (b) the testator's acknowledgement of his signature or of the will.

The narrow issue in this case is whether the statute authorizes a person who has witnessed the testator's execution or

acknowledgement of the will to sign the will as a witness after the testator has died; the broader issue is whether the statute places any limits on how long after the testator's execution or acknowledgement of the will a witness may affix his or her signature. These questions are necessarily determined by what the Legislature intended by the formalities that are prescribed in *N.J.S.A.* 3B:3–2, and by the extent to which the Legislature intended that these formalities be strictly followed.

### A.

Wills are solely the creatures of positive law. "The right to make a will . . . is derived from the statute." A. Clapp, 5 *New Jersey Practice, Wills and Administration* § 41, at 173 (3d ed. 1982). As was stated by this Court in *United States v. Kingsley*, 41 *N.J.* 75, 79 (1963):

> The right of a citizen to dispose of his property by will has always been deemed a legislative creation. The state may regulate the manner and terms upon which his property, both real and personal, within its jurisdiction may be transmitted by will or by inheritance. It may prescribe who shall take, and who shall not be capable of taking, the property. And the privilege of transmission of property by will or by intestacy may be made subject to such terms as in the judgment of the state will serve the public good.

Historically, courts have held that, as statutory creations, wills must adhere to the requirements prescribed by the statute. Failure to comply with the statutory requirements has long resulted in a will being declared invalid, no matter how accurately the document may have reflected the wishes of the testator. *See Murray v. Lewis*, 94 *N.J.Eq.* 681, 684 (Ch.Div. 1923).

This policy of construing the wills statute's formalities strictly came to be criticized for producing inequitable results and for encouraging, in effect, the circumvention of the wills statutes through such means as conveyances in joint tenancy, revocable trusts, tentative or "Totten" trusts, and cash value life insurance policies. *See* Langbein, "Substantial Compliance With the Wills Acts," 88 *Harv.L.Rev.* 489, 503–09 (1975) ("the flexibility and comparative informality of the will substitutes

... is making the rule of literal compliance with Wills Act formalities ever more incongruous and indefensible"); *see also* Langbein, "The Nonprobate Revolution and the Future of the Law of Succession," 97 *Harv.L.Rev.* 1108 (1984) (describing will substitutes). The perception of inequitable results, coupled with the decline of wills, relative to other instruments, as means of devising property after death, led the National Conference of Commissioners of Uniform State Laws and the American Bar Association, in August 1969, to propose adoption of the Uniform Probate Code. The Code's approach was not to encourage courts to abandon their strict construction of the formalities prescribed, but rather to reduce the number and refine the scope of those formalities so that, if strict construction were employed, "inequities" in individual cases would occur less frequently and would be justified by the importance of the interests protected by the formal requirements that were retained. *See* Love, "Imperfect Gifts as Declarations of Trust: An Unapologetic Anomaly," 67 *Ky.L.J.* 309, 329–31 (1978–79) ("The bare-bones formalities that remain [in the UPC] for a valid witnessed will are those that most laymen would associate with a will"). Thus, the General Comment to Part Five of the Code states:

> If the will is to be restored to its role as the major instrument for disposition of wealth at death, its execution must be kept simple. The basic intent of these sections is to validate the will whenever possible. To this end, ... formalities for a written and attested will are kept to a minimum....

A second approach to reform was proposed in 1975 by Professor John Langbein, in "Substantial Compliance With the Wills Act," *supra*, 88 *Harv.L.Rev.* 489. According to Professor Langbein, "[t]he finding of a formal defect should lead not to automatic invalidity, but to a further inquiry: does the noncomplying document express the decedent's testamentary intent, and does its form sufficiently approximate Wills Act formality to enable the court to conclude that it serves the purposes of the Wills Act?" *Id.* Thus, while addressing the same ills, the Uniform Probate Code and the substantial compliance doctrine endorse different remedies; the Uniform Probate Code reduces

the number and refines the scope of formalities, whereas the "substantial compliance" approach relaxes the extent to which whatever formalities exist must be honored. One approach addresses the formalities themselves; the other addresses the formalism with which they are construed. As Professor Langbein put it,

[w]hereas the argument [for substantial compliance] is for a rule of reduced formalism in enforcing whatever formalities the Wills Act requires, the UPC approach is to reduce the number of required formalities. Although both techniques work generally in the same direction, they will produce different results in many cases if the UPC's "minimal formalities" are to be enforced with the same literalism as before. [*Id.* at 512.]

This state's former statute, *N.J.S.A.* 3A:3-2 (repealed), was rife with the formal encrustations that had inspired the proposals for reform.[2] It required that the testator sign his will (or acknowledge his signature) before two witnesses, both of whom were required to be present at the same time; that he declare the document to be his will; and that the witnesses subscribe the will in the presence of the testator. *See In re Hale's Will,* 21 *N.J.* 284, 295–97 (1956). The Legislature responded to the infirmities of the statute by enacting the Probate Reform Act of 1978, *L.* 1977, *c.* 412 (effective September 1, 1978), the current statute.

The current statute, a variant of the Uniform Probate Code, constitutes a significant statutory change from its predecessor with respect to how a will must be witnessed. *See, e.g., Estate of Cunningham,* 198 *N.J.Super.* 484, 487 (Law Div.1984); *Matter of Fernandez' Estate,* 173 *N.J.Super.* 240, 245 (Law Div. 1980). In accordance with the Uniform Probate Code, the thrust of the change is to reduce the number of formalities

---

2The Statement to Senate Bill No. 902, a precursor of the Reform Act, observed that "the statutes in New Jersey [presently] require great formalities in the execution of a will and often result in home-drawn wills being refused probate merely because some formality was not followed, or if followed, cannot be proved." *See* State of New Jersey, Division of Law Revision, Legislative Services Agency, *1972–73 Legislation from the Proposed Uniform Probate Code,* at 13 (1973).

entailed in the witnessing of the execution of a will and, in doing so, to ease the difficulty of complying with the formalities that are prescribed for witnesses.[3]  Thus, as to the witnessing prescription, the current statute, *N.J.S.A.* 3B:3–2, no longer requires the witnesses to sign the will in the presence of the testator and in the presence of each other.  A. Clapp, 5 *N.J. Practice, supra*, § 50, at 193.  The Official Comment to the companion provision of the Uniform Probate Code explains the policy reform:

> The formalities for execution of a witnessed will have been reduced to a minimum....  There is no requirement that the testator publish the document as his will, or that he request the witnesses to sign, or that the witnesses sign in the presence of the testator or of each other....  The intent is to validate wills which meet the minimal formalities of the statute.
>
> [Comment, § 2–502, Uniform Probate Code.]

Plaintiff argues that the repeal of *N.J.S.A.* 3A:3–2 and the elimination of the requirement that the witness sign in the presence of the testator indicate that the Legislature intended that a witness could sign a will as a subscribing witness at any time after the testator has signed or acknowledged the will, even after the testator's death.  Plaintiff points to the lack of any other restrictions in the statute relating to when witnesses may sign a will.  Plaintiff thus argues that the procedure employed here was within the contemplation of the statute.  In the alternative, plaintiff argues that, in the absence of any allegation of fraud, the will should be validated as in substantial compliance with the statute.  We treat first the argument that the procedure involved here—allowing the witness to sign

---

[3]Comments prepared by Legislative Services for use by the Senate Judiciary Committee at public hearings explained that enactment of the relevant Uniform Probate Code provision would eliminate the requirement that both witnesses to the making or acknowledgement of a will be present at the same time and would substitute a requirement that the will need be merely signed by two witnesses, each of whom witnessed either the signing or the testator's acknowledgement of the signature on the will.  The Assembly Committee Statement to the Act also indicates that "Section 4 [now *N.J.S.A.* 3B:3–2] relaxes the formalities required in the execution of a will so that the testator and both witnesses need not be present at the same time."

the will some eighteen months after the will was witnessed, where the testator had died with the will unsigned by witnesses some fifteen months after the will was witnessed—complies with the statute.

### B.

■ It cannot be overemphasized that the Legislature, in reforming the Wills statute, did not dispense with the requirement that the execution of a will be witnessed. Indeed, it is arguable that as the number of formalities have been reduced, those retained by the Legislature have assumed even greater importance, and demand at least the degree of scrupulous adherence required under the former statute.

It is generally acknowledged that witnesses serve two functions, which can be characterized as "observatory" and "signatory." A. Clapp, 5 *N.J. Practice, supra,* § 50 at 192. The current statute, *N.J.S.A.* 3B:3-2, clearly requires the fulfillment of both functions; a testamentary writing proffered as a will, in the statute's terms, "shall be *signed* by at least two persons each of whom *witnesses* either the signing or the testator's acknowledgement of the signature or of the will." *Id.* (emphasis added).

■ The observatory function consists of the actual witnessing—the direct and purposeful observation—of the testator's signature to or acknowledgement of the will. It entails more than physical presence or a casual or general awareness of the will's execution by the testator; the witnessing of a will is a concomitant condition and an integral part of the execution of the will.

The signatory function consists of the signing of the will by the persons who were witnesses. The signatory function may not have the same substantive significance as the observatory function, but it is not simply a ministerial or precatory requirement. While perhaps complementary to the observatory function, it is nonetheless a necessary element of the witnessing

requirement. The witness' signature has significance as an evidentiary requirement or probative element, serving both to demonstrate and to confirm the fulfillment of the observatory function by the witnesses. There is nothing, therefore, to suggest that in retaining the requirement that a will's execution be witnessed, the Legislature meant to imply that either witnessing function is dispensable. The statutory policy to reduce the required formalities to a minimum should not, in our view, be construed to sanction relaxation of the formalities the statute retained.

■   Resolution of the issue of when the witnesses must sign the will in relation to their observations of the execution of the will by the testator follows from the purpose of the requirement that the will be signed. Because, as noted, the signatory function serves an evidentiary purpose, the signatures of the witnesses would lose probative worth and tend to fail of this purpose if the witnesses were permitted to sign at a time remote from their required observations as witnesses. Consequently, because the witnessing requirement of the statute consists of the dual acts of observation and signature, it is sensible to infer that both acts should occur either contemporaneously with or in close succession to one another.

We are thus satisfied that it would be unreasonable to construe the statute as placing no time limit on the requirement of obtaining two witnesses' signatures. By implication, the statute requires that the signatures of witnesses be affixed to a will within a reasonable period of time from the execution of the will.

■■   This reading of *N.J.S.A.* 3B:3–2 to require subscription within a reasonable time from observation is buttressed by a consideration of other statutory provisions. The Legislature clearly required that a witness actually observe directly and in his or her presence the testator's signing of the will or acknowledgement that the will bears the witness's signature. If, indeed, the will is to be "self-proving," that is, susceptible of

being validated solely by the signed acknowledgement of the witnesses, the will must be signed by the witness in the presence of the testator either at the time the testator executed the will, *N.J.S.A.* 3B:3–4, or subsequent to the execution of the will, *N.J.S.A.* 3B:3–5. If a will cannot be "self-proving," then at the very least *N.J.S.A.* 3B:3–2 requires that the witness himself sign the will intending that the signature be that of a witness to the testator's signing or acknowledgement, and that the witness' signature be affixed to the will within a reasonable period of time following the testator's execution or acknowledgement of the will. In other words, since the witnessing of the will still constitutes a part of the formal ceremony entailed in the will's proper execution, it follows that the signing of the will by the witnesses must be within a reasonable period of time of the signing or acknowledgement of the will by the testator.

The requirement of subscription within a reasonable time follows also from the consistent policy of this state that execution formalities are substantive requirements, and, therefore, that execution defects are substantive. *See Watkins v. Watkins*, 82 *N.J.Eq.* 483, 485 (Ch.Div.1913). Because the purpose of execution formalities is to prevent fraud and undue influence, they have consistently been held by our courts to be substantive requirements. The fact that the Legislature has reduced the number of execution formalities required does not diminish the significance of the formalities it retained; if anything, in our view, their significance is heightened. What this Court stated in *In re Hale's Will, supra*, 21 *N.J.* at 297, is no less true under the reformed statute: the purpose of execution formalities is to "forestall[ ] fraud by the living upon the dead [and to] discourage imposition on the unwary...." *See also In re Taylor's Estate*, 28 *N.J.Super.* 220, 225–26 (App.Div.1953) (statute's execution requirements intended to "forestall frauds by the living upon the dead"); *Murray v. Lewis, supra*, 94 *N.J.Eq.* at 684–85 (equity may not be invoked to cure a defect in execution); 2 W. Bowe & D. Parker, *Page on the Law of Wills*

§ 19.4, at 66 (rev. ed. 1960) (purpose of wills statute is to prevent "fraud, perjury, mistake and the chance of one instrument being substituted for another").

In *Matter of Estate of Cosman*, 193 *N.J.Super.* 664 (App.Div. 1984), the court was requested to enforce on equitable grounds an oral contract to make a will, despite the contract's failure to comply with *N.J.S.A.* 3B:1-4 (adapted from Uniform Probate Code § 2-701). The court noted the general rule that when a statute is clear on its face, it must be enforced by the courts "as written and not according to some unexpressed intention." *Id.* at 671 (quoting *Dacunzo v. Edgye*, 19 *N.J.* 443 (1955)). It therefore held:

> The principles of equitable fraud ... urged by respondent are unavailing in the face of the unequivocal legislative declaration. Were we to enforce such principles we would nullify the clear purpose of the statute.... The resulting inequities were not occasioned by the law but by their failure to adhere to it. [*In re Estate of Cosman, supra*, 193 *N.J.Super.* at 670-71.]

The principle that the reform of the wills statute does not entail the abandonment of the settled mode of construction of wills is similarly reflected in our recent opinion, *Matter of Alleged Will of Smith*, 108 *N.J.* 257 (1987), in which we ruled that the statutory provision authorizing the validation of holographic wills required a clear expression of testamentary intent. Justice Pollock observed:

> Although the statute does not allude to it, testamentary intent has always been a prerequisite to admission of an instrument to probate.... Although the Wills Act recognizes holographic wills as valid, whether witnessed or not, nothing suggests that the Legislature intended to eliminate testamentary intent ... for a holographic ... will. [*Id.* at 262 (citations omitted).]

As the Appellate Division in this case pointed out, while the new statute reduces the number and extent of the formalities required, its continued prophylactic purpose to prevent fraud indicates that the remaining formal requirements may not be ignored on equitable grounds. *In re Estate of Peters, supra*, 210 *N.J.Super.* at 306.

Given our conclusion that the witnesses must sign within a reasonable time from observation, the question is whether the

time period involved here—in which the testator died with the will still unsigned by witnesses fifteen months after the will was witnessed—is reasonable. Two factors in this case affect our determination of reasonableness: (1) the fact that the witness signed after the testator's death; and (2) the fact that some eighteen months passed between the observatory and signatory functions of the witness. While there have been no New Jersey cases addressing the issue of whether a witness may sign a will after the testator's death, the problem has been treated in other jurisdictions. In *In re Estate of Flicker*, 215 *Neb.* 495, 339 *N.W.*2d 914, 915 (1983), the Nebraska Supreme Court observed that the purpose of the witnessing requirement is to prevent fraud or mistake, and that permitting witnesses to sign after the testator's death "would erode the efficacy of [this] safeguard...." Thus, "[the witnesses'] signatures are the last acts in the ceremony required by the statute. By its terms, the statute requires a witness to sign." *See also Matter of Estate of Mikeska*, 140 *Mich.App.* 116, 362 *N.W.*2d 906, 910 (1985) ("We agree with the holding in *Flicker*, as well as with the rationale"); *Rogers v. Rogers*, 71 *Or.App.* 133, 691 *P.*2d 114 (1984) (a will, as an ambulatory instrument, takes effect at the time of the testator's death; failure to comply with the formalities of execution by the time the testator has died results in an invalid will).

■■ In this case, the Appellate Division declined to adopt a bright-line rule under *N.J.S.A.* 3B:3–2 requiring witnesses' signatures before the death of the testator. It expressly left open the question raised by *In re Leo's Will*, 12 *Fla.Supp.* 61 (Fla.Dade Co.Cir.Ct.1958), concerning the validity of a will where a testator has died moments after execution, but before the witnesses have had an opportunity to sign. *In re Estate of Peters, supra*, 210 *N.J.Super.* at 305. We endorse this conclusion. There may indeed be cases in which the affixation of witnesses' signatures after the testator's death would be reasonable, particularly if the witnesses were somehow precluded from signing before the testator died. This case, however, does

not present such a situation. Even if one accepts the testimony that the emotional trauma of the moment prevented the witnesses from signing the will while the testator was hospitalized, there is simply no adequate explanation of the failure to have obtained their signatures in the extended fifteen-month interval prior to his death. If the Legislature's retention of the signing requirement is to be at all effectual, signing must occur within a reasonable time of observation to assure that the signature attests to what was actually observed, and not to what is vaguely remembered. While this requirement does not necessarily entail subscription prior to the testator's death, the interval here between the observation and the testator's death was simply too long for subscription after death to have been reasonably within the contemplation of the statute.

## C.

Plaintiff argues in the alternative, however, that even if compliance with execution formalities was defective, this Court should validate the will in the absence of any allegation of fraud because it was in "substantial compliance" with the statute. Thus, given the historical trend toward liberalization of the wills statute described above, and the policy favoring validation of wills that "meet the minimal formalities of the statute," the ultimate question raised by this case is how courts should construe wills that fail to satisfy even the "minimal formalities" retained in the statute.

As Professor Langbein has explained, "[t]he substantial compliance doctrine would permit defective compliance with ... ceremonials to be evaluated purposively. It would permit the proponents to prove that in the circumstances of the case the testator executed the will with finality and that the execution is adequately evidenced notwithstanding the defect." Langbein, "Substantial Compliance with the Wills Act," *supra*, 88 *Harv.L. Rev.* at 521. The doctrine has been criticized, however, because it reduces predictability of wills:

> The argument in favor of the implementation of the substantial compliance doctrine is that, while it lacks the predictability of the U.P.C., it does insist upon a higher degree of formality yet with the understanding that where the failure to comply with any formality is shown, proof may be received to demonstrate that the function of the formality has still been met.... The problem is that wills are unlike the world of contract where the demands of business often necessitate informality.... Wills are more often made without such demands of time pressure. The testator has every opportunity to comply with formality requirements....
>
> A second problem is the ambiguity of "substantial compliance." ... Does it mean that some formalities are more important than others and that substantial compliance involves completion of only the important formalities?
>
> [Nelson and Starck, "Formalities and Formalism: A Critical Look at the Execution of Wills," 6 *Pepperdine L.Rev.* 331, 355 (1979).]

In addition, the doctrine's reliability has been questioned because of its emphasis upon evidence of testamentary intention and the recollection of distant, indistinct events. Irmiston, "Formalities and Wills: A Plea for Caution," *American/Australian/New Zealand Law: Parallels and Contrasts*, A.B.A., 72, 74 (1980). This has led to rejection of the doctrine in some states, where it has been found to "lead to confusion and uncertainty." *Hopkins v. Hopkins*, 708 *S.W.*2d 31, 32 (Tex.Ct. App.1986).

The Appellate Division correctly noted that the New Jersey courts have generally rejected a rule of substantial compliance. *In re Estate of Peters, supra,* 210 *N.J.Super.* at 307. In *In re Hale's Will, supra,* 21 *N.J.* at 295, this Court stated that "although on at least one occasion in this state it has been suggested that substantial compliance ... is all that should be required, our more authoritative appellate tribunals have been averse to the adoption of any such view...." Our courts have thus acknowledged the important policy interest advanced by a rule of strict compliance. In *In re Taylor's Estate,* 28 *N.J.Super.* 220, 225 (App.Div.1953), where the issue was whether the witnesses actually saw the testator execute a will, the court declined to follow the substantial compliance approach. In *In re Johnson's Will,* 115 *N.J.Eq.* 249, 253–54 (Prerog.Ct.1934), the court denied probate to a will on defective publication

grounds, despite its recognition that the document was clearly intended to be the testator's will. · The court stated:

> It is said that such a construction of the demands of the statute as this is harsh and may work an injustice. The answer is that the statute expresses the legislative requirement for a valid will, and until that body sees fit to change it, the courts are not at liberty to do so.

*Id.* at 244; *see also In re Baker's Will*, 68 *N.J.Super.* 574, 588 (App.Div.1961) ("the solemn function of witnessing a will ... must be performed with strict adherence to the statutory formalities"); *Murray v. Lewis, supra*, 94 *N.J.Eq.* at 684 ("A writing may express clearly the wish or intention of a decedent, but if the statutory formalities have not been followed, it is not a valid will").

It is undeniable that in liberalizing execution formalities in accordance with the Uniform Probate Code, the Legislature was responding to the perceived inequities resulting from strict construction of the former statute. The Legislature's response, as we have seen, was to reduce the number of formalities with which compliance is required, not necessarily to relax the extent to which the remaining "minimal formalities" must be honored; plaintiff now asks this Court to take this process of liberalization a step further by holding that, in the absence of fraud, even defective compliance with the remaining formalities may be sufficient.

To do so on the facts of this case would, in our view, effectively vitiate the statutory requirement that witnesses sign the will.[4] We continue to believe that, as a general proposition, strict, if not literal, adherence to statutory requirements is required in order to validate a will, and that the statutory requirements must be satisfied regardless of the possibility of

---

[4]We are unwilling to foreclose consideration of the substantial compliance doctrine in a case where there is no question of fraud, and where, unlike this case, there has been a clear attempt to comply with a statutory formality but compliance is deficient. In this case, however, the statutory formalities contemplate at a minimum witnessing by *two* persons; the treatment of a notary's signature as that of a witness does not compensate for the absence of the signature of a second witness.

fraud in any particular case. *Cf. Matter of Will of Smith, supra,* 108 *N.J.* at 261, 265–266 ("we reach our conclusion [that an alleged holographic will was invalid because there was no proof of the required testamentary intent] notwithstanding the concession ... that the document complies with the formal requirements for a holographic will ... and that it represents the decedent's intentions for the disposition of her estate"). The doctrine of strict adherence to statutory requirements follows from the status of wills as creatures of statutory law, and from the statutory purpose to prevent fraud upon the estate of the deceased:

> If the testator has not complied with the statutes which regulate the execution of the will, his intention to pass his property by will has no legal effect; and it will be ignored by the courts. On the other hand, a will is valid, as far as execution is concerned, if it complies with statute, although the courts may feel that the legislature would have acted more wisely in requiring other formalities....
>
> The purpose of these statutes is to make it certain that testator has a definite and complete intention to pass his property, and to prevent as far as possible, fraud, perjury, mistake and the chance of one instrument being substituted for another.
>
> [2 Bowe-Parker, *Page on Wills,* § 19.4, pp. 63–66 (1960).]

Courts have recognized, moreover, that "[t]he fact that there is no fraud, or even a suggestion or intimation of it, will not justify the courts in departing from the statutory requirements, even to bring about justice in the particular instance, since any material relaxation of the statutory or codal rule will open up a fruitful field for fraud, substitution, and imposition." *Succession of Roussel,* 373 *So.*2d 155, 157 (La.1979). *Compare In re Petkos' Will,* 54 *N.J.Super.* 118, 120–25 (App.Div.), certif. denied, 30 *N.J.* 150 (1959) (testator's publication accepted where the testator's lawyer announced, in testator's presence, that the document was the testator's will) *with Ludlow v. Ludlow,* 35 *N.J.Eq.* 480, 489 (Prerog.Ct.1882), aff'd, 36 *N.J.Eq.* 597 (E. & A.1883) (substantial compliance doctrine cannot validate a will where there was no evidence of publication). To adopt the doctrine of substantial compliance on the facts of this case would unsettle the probate process and undermine the reform enacted by the Legislature.

## IV.

The prophylactic purpose of preventing fraud would be substantially undermined if "witnesses" to a will that contained no witnessing signatures could testify to their presence at execution, no matter how much time had elapsed between execution and the affixing of their signatures. As the Appellate Division pointed out, such an approach would have the effect of eliminating the signing requirement in its entirety. By acknowledging that there may be some cases where post-execution signatures may not be barred, the Appellate Division opinion indicates that witnesses' signatures may be obtained within a reasonable period after the will is executed. We agree; compliance in such cases need not necessarily be considered defective. We further concur in the Appellate Division's conclusion that a fifteen-month interval, without any extenuating circumstance, is too long to be reasonable, and may not be salvaged by resort to the doctrine of "substantial compliance."

Accordingly, for the reasons stated, the judgment below is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.