743 P.2d 994 (1987)
113 Idaho 341
In the Matter of the ESTATE OF Edward Reese McGURRIN, Deceased.
Heidi McGURRIN and Flicka McGurrin, Appellants-Cross Respondents,
v.
Charles O. SCOGGIN, Respondent-Cross Appellant.
Avery FLOYD and Cindy Rood, Appellants,
v.
Heidi McGURRIN, Flicka McGurrin and Charles O. Scoggin, Respondents.
Nos. 15841, 15868.
Court of Appeals of Idaho.
September 9, 1987.
Petition for Review Denied November 20, 1987.
*995 John C. Hohnhorst (Hepworth, Nungester, Felton & Lezamiz), Twin Falls, for appellants McGurrin.
Richard D. Greenwood (Stephan, Slavin, Kvanvig & Greenwood), Twin Falls, for appellants Floyd and Rood.
Jacqueline S. Wakefield (argued), and John A. Doerr (Doerr & Trainor), Twin Falls, for respondent Scoggin.

SUBSTITUTE OPINION

The Court's prior opinion, dated September 25, 1986, is hereby withdrawn.
BURNETT, Judge.
These consolidated appeals present a question of first impression under the Uniform Probate Code, as adopted in Idaho. The requirements for a valid will are enumerated in I.C. § 15-2-502. One such requirement is that the will be signed by the testator and (unless the will is holographic) by two other persons, each of whom has "witnessed" the testator signing or acknowledging the will. In the present case, the testator apparently signed his will when no one else was present. An intermediary then took the will to two other persons, who added their signatures to the document. The testator's only contact with these persons was by telephone after all signatures had been affixed. He thanked them for "witnessing" his will. The question framed by these facts is whether the will was executed in compliance with I.C. § 15-2-502.
The will was offered for probate in the magistrate division of the district court. A magistrate admitted the will, holding that it had been satisfactorily acknowledged by the testator to the witnesses. On appeal, the district judge reversed and directed the will to be stricken. For reasons explained below, we agree with the district judge.

I
We preface our analysis by noting additional background facts. Edward McGurrin died in 1983. After his death, several wills were discovered. Two of them were offered for probate. The will at issue here came to be known as the "Rood will" because it was typed by the decedent's secretary, Cindy Rood.
Preparation of this will began at a hospital where McGurrin was a patient. He summoned his secretary to the hospital and dictated the will. She promptly typed the document from her dictation notes and delivered it to the hospital. When she visited McGurrin the next day, she observed that the will had been signed. McGurrin then asked her to take the will home and to have her mother and sister sign it. She complied. After she returned the fully signed will to McGurrin, he asked her to call her mother and sister on a hospital telephone. She got both of them on the line and handed the telephone to McGurrin, who thanked them for "witnessing" his will.
McGurrin died about four months after signing the "Rood will." The will nominated his friend, Avery Floyd, to serve as executor. A handwritten statement, inserted among the typed provisions of the will, gave Floyd a "one-fifth interest" in McGurrin's estate. The will further recited: "I here by [sic] nominate and appoint four (4) other people to share in my estate, share and share alike." (Emphasis added.) *996 However, the will mentioned only three "other" persons: Cindy Rood, Erma Donelli (a former employee), and Charles Scoggin (a friend and professional associate). The magistrate who admitted the will to probate interpreted the instrument as effectively disposing of four-fifths of McGurrin's estate. The remaining one-fifth was deemed to pass by intestacy to McGurrin's sole heirs at law  his nieces, Heidi and Flicka McGurrin.
On appeal to the district court, the magistrate's ruling was attacked from two directions. Charles Scoggin contended that the "Rood will" was invalid under I.C. § 15-2-502. He offered for probate a prior will, which has come to be called the "Scoggin will," giving him all of the decedent's estate. In contrast, the McGurrin nieces argued that the magistrate correctly admitted the "Rood will" but that he had erred by construing it to give Floyd a one-fifth interest. The nieces pointed to testimony by the secretary's sister that the handwritten statement referring to Floyd's interest had not been in the will when she signed it. The secretary's mother could not recall with certainty whether the handwritten statement existed when she signed.
As mentioned earlier, the district court overturned the magistrate's order admitting the "Rood will." In a thorough and well-reasoned decision, the district judge held that the will had not been executed in conformity with I.C. § 15-2-502. Consequently, the district judge found it unnecessary to address the nieces' contention that the will had been construed erroneously. The case was remanded to the magistrate division for a determination as to whether the prior will offered by Scoggin should be admitted. Avery Floyd, Cindy Rood and the McGurrin nieces then filed the instant appeals. Scoggin cross-appealed, contending that the district judge should have decided the admissibility of the prior will rather than remanding the case on that issue.

II
As we inquire into the validity of the "Rood will," we are mindful that an individual's right to direct the distribution of his property after death is firmly established in the Anglo-American legal tradition. But the right is legislative in origin, and exercise of the right historically has been conditioned upon compliance with legislatively prescribed formalities. In England the requirement of a formal testamentary instrument was codified in the Statute of Wills. The Statute of Frauds later imposed an additional requirement that persons devising real property sign their wills in the presence of attesting witnesses. T. ATKINSON, HANDBOOK ON THE LAW OF WILLS § 3 (2d ed. 1953).
The witness requirement eventually found its way into statutes enacted in the United States. It was broadened to encompass wills disposing of either real or personal property. The purposes of the requirement have been summarized variously as authenticating the document, solemnizing its execution, and guarding against undue influence or fraud. E.g., Succession of Michie, 183 So.2d 436 (La. Ct. App. 1966); Matter of Estate of Martinez, 99 N.M. 809, 664 P.2d 1007 (Ct.App. 1983); see generally 79 AM.JUR.2d Wills § 259 at 458-459 (1975). To effectuate these purposes, witnesses are said to perform two functions  an observatory function and a signatory function. The former consists of "direct and purposeful observation" of the testator's signature to, or acknowledgment of, the will. Estate of Peters, 107 N.J. 263, 526 A.2d 1005, 1011 (1987). The latter consists of the witnesses' signing of the will, a task "complementary" to the observatory function. Id.
In Idaho it is well settled that an individual's right to direct the distribution of his property after death is regulated by statute. Our Legislature sets the standards for execution of valid wills. In re Estate of Lane, 99 Idaho 850, 851, 590 P.2d 577, 578 (1979). From the territorial era until 1971, these standards were contained in I.C. § 14-303 and its predecessors. The statute provided as follows:
Execution of will.  Every will, other than a nuncupative will, must be in writing, and every will, other than a holographic *997 will and a nuncupative will, must be executed and attested as follows:
1. It must be subscribed at the end thereof by the testator himself, or some person in his presence and by his direction must subscribe his name thereto;
2. The subscription must be made in the presence of the attesting witnesses or be acknowledged by the testator to them, to have been made by him or by his authority;
3. The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will; and
4. There must be two attesting witnesses, each of whom must sign his name as a witness, at the end of the will, at the testator's request, and in his presence. [Emphasis added.]
This language mandated that the witnesses be present when the testator signed or acknowledged his will and that the testator be present when the witnesses added their signatures.
In 1971 Idaho became the first state to adopt the Uniform Probate Code. Section 2-502 of the U.P.C., codified as I.C. § 15-2-502, replaced I.C. § 14-303. The new statute provided, and to this day continues to provide, as follows:
Except as provided for holographic wills ... every will shall be in writing signed by the testator or in the testator's name by some other person in the testator's presence and by his direction, and shall be signed by at least two (2) persons each of whom witnessed either the signing or the testator's acknowledgment of the signature or of the will. [Emphasis added.]
This statute, unlike former I.C. § 14-303, does not require the testator to be present when the witnesses add their signatures to the will. In that respect, the "presence" requirement has been narrowed. However, the new statute provides that these persons must have "witnessed" the testator performing one of three acts: signing the will, acknowledging the document as his will, or acknowledging his signature on the will. (For ease of reference, the latter two acts often are described simply as "acknowledging the will.") By employing the word "witnessed"  a verb in the past tense  the statute clearly denotes that the witnesses must perform a function antecedent to the mere affixing of their own signatures. They must observe the testator sign or acknowledge the will. In that respect, the "presence" requirement has been retained.
However, in this case, the proponents of the "Rood will" would have us interpret I.C. § 15-2-502 differently. They contend that the statute has abolished any presence requirement. In their view, witnesses under the Uniform Probate Code perform little more than a signatory function. We think this argument founders upon the plain meaning of the verb "witnessed" as used in the statute. But even if we did not believe the statute conveys such a plain meaning, we still would reach the same conclusion for the additional reasons explained below.

A
If a statute requires construction, our task is to ascertain the underlying legislative intent. Indicia of intent may be gleaned from an historical inquiry into the "occasion and necessity of the law, from the mischief felt, and the remedy in view." Knudsen v. Boundary County School District, 104 Idaho 93, 97, 656 P.2d 753, 757 (Ct.App. 1982). Here, the history of I.C. § 15-2-502 takes us back to the evolution of the Uniform Probate Code.
The U.P.C. was promulgated by the Commission on Uniform State Laws in 1969.[1] It represented many years of effort by a drafting committee within the Commission. In 1968, as the committee's work moved toward finality, the Commission constituted itself as a Committee of the Whole to examine a draft of the new Code. At that *998 time, proposed section 2-502 provided as follows:
Except as provided in section 2-505 [relating to holographic wills], every will shall be in writing signed by the testator or in the testator's name by some other person in the testator's presence and by his direction, and shall be signed by two witnesses in the presence of the testator.
The drafters of this proposal told the Committee of the Whole that they hoped to eliminate several burdensome requirements found in many state statutes  e.g., that the testator not only sign the document, but also declare it to be his will, in the presence of the witnesses; that the witnesses sign the will in the presence of each other; and that the witnesses act upon the testator's request. The proposed section did not explicitly require the witnesses to be present when the testator (or someone on his behalf) signed the will. However, the proposed section did retain a requirement existing in Idaho and elsewhere, that the witnesses sign in the testator's presence. Thus, in-person contact between the testator and the witnesses, at some point, was still deemed to be a necessary part of the execution process.
There was little disagreement with the goal of simplifying the will execution process. Neither did members of the Committee question retaining some form of in-person contact between the testator and the witnesses. But they did express concern that the proposed section, which did not require the in-person contact to occur until the witnesses signed the will, relegated the witnesses to merely "witnessing" a thing (the document with the testator's signature on it) rather than an event (the testator's act of signing or acknowledging the will). This debate carried over to 1969, when a revised version of the entire Code, but a substantially similar version of section 2-502, was considered. Members of the Committee suggested that witnesses should "witness" an act  either the testator's signing of the will or his declaration that he had done so. As a result of this discussion, section 2-502 was remanded to the drafters for more work. When the drafters submitted a revised version to the Committee of the Whole, it was further amended. The final language is now contained in I.C. § 15-2-502, which we quote again for convenience:
Except as provided for holographic wills ... every will shall be in writing signed by the testator or in the testator's name by some other person in the testator's presence and by his direction, and shall be signed by at least two (2) persons each of whom witnessed either the signing or the testator's acknowledgment of the signature or of the will. [Emphasis added.]
This language converted a noun ("witnesses"), which had appeared in prior drafts, to a transitive verb ("witnessed"), expressed in the active voice and in the past tense. The direct objects of the new verb were the words "signing" and "acknowledgment," referring to acts by the testator. Such restructuring of the statute was more than an exercise in English grammar. It enabled the statute to specify what the witnesses would do. The new language made it clear that witnessing meant more than merely perceiving the existence of a document and signing it. Witnessing meant perceiving an act of the testator  signing or acknowledging the will  and memorializing this perception by subscribing the document.
By using the verb "witnessed," and by directing this verb toward certain antecedent acts of the testator, the drafters of section 2-502 plainly contemplated that at least one of these enumerated acts would occur where it could, in fact, be "witnessed." After such an act had been "witnessed," it became immaterial whether the witnesses added their signatures to the will in the testator's presence or elsewhere. Accordingly, the clause in earlier drafts, requiring the will to "be signed by [the] witnesses in the presence of the testator," was dropped.
By dropping this clause, the drafters manifested no intent to discontinue the in-person contact requirement entirely. Such a change from prior drafts and from existing law would have been profound. It *999 undoubtedly would have generated much comment among the Commissioners. But in reporting the final draft of section 2-502 to the Committee of the Whole, the co-chairman of the drafting committee, Charles Horowitz, stated simply:
I have been asked to call your attention to the substantive changes. I call your attention to the following.
First, we have substituted for the word "witnesses" the word "persons." Secondly, we have identified the thing to which they are witness, the subject matter that is witnessed. They witness any one of three things: signing  that is, the actual process of signing by the testator  or the testator's acknowledgment of his signature, or the acknowledgment of the testator that this is his will. Any one of those three things will suffice.
There was no suggestion that the in-person contact requirement had been wholly abandoned.
The official comment to section 2-502 also conveys, albeit rather awkwardly, the idea that witnessing is an active function, directed toward certain observable conduct of the testator:
The formalities for execution of a witnessed will have been reduced to a minimum. Execution under this section normally would be accomplished by signature of the testator and of two witnesses; each of the persons signing as witnesses must "witness" any of the following: the signing of the will by the testator, an acknowledgment by the testator that the signature is his, or an acknowledgment by the testator that the document is his will. ... There is no requirement that the testator publish the document as his will or that he request the witnesses to sign, or that the witnesses sign in the presence of the testator or of each other. The testator may sign the will outside the presence of the witnesses if he later acknowledges to the witnesses that the signature is his or that the document is his will, and they sign as witnesses.... The intent is to validate wills which meet the minimal formalities of the statute. [Emphasis added.]
Thus, the comment recognizes that although it is no longer necessary for the testator and witnesses to sign in each other's presence, the testator is required to declare his acknowledgment "to the witnesses." See also R. Wellman, The Uniform Probate Code Practice Manual, pp. 132-33 (1977).
In sum, we think the evolution of U.P.C. § 2-502 reveals no intent to abolish the in-person contact requirement entirely. Rather, we think the requirement was narrowed. Witnesses are no longer required to sign the will in the presence of the testator. Conversely, the testator may sign outside the presence of the witnesses if he declares his acknowledgment to them. But in all instances, the witnesses must have "witnessed" one of the testator's acts before signing the will themselves. The signatory function of the witnesses remains linked to the observatory function.
There are, of course, differences of opinion regarding the modern importance of the observatory function performed by witnesses. But this, in the last analysis, is a legislative issue. The drafters of the U.P.C. recognized that a will, unlike a deed or an inter vivos trust instrument, becomes effective only after its author is dead. If the validity of the instrument is challenged, the decedent cannot explain the circumstances attending its execution. Accordingly, the drafters concluded that although formal execution requirements should be minimized, there ought to remain  in the words of co-chairman Horowitz  "two people who will testify as to the circumstances under which the will was executed... ." Such testimony would be meaningful only if it came from persons who "witnessed" the testator signing or acknowledging the will.
Accordingly, we reject the appellants' argument that because the Uniform Probate Code does not express the "presence" requirement in the same way as the prior Idaho statute, any such requirement has been wholly abolished.[2] This simplistic inference *1000 is rebutted by the ultimate language, and by the drafting history, of section 2-502.

B
Our search for indicia of legislative intent also takes us to another statute relating to the same general subject. Idaho Code § 15-2-504, derived from U.P.C. section 2-504, authorizes self-proving wills and prescribes the content of self-proving attestation clauses. Wills containing these clauses may be admitted to formal probate without testimony from the subscribing witnesses. The official comment to this section states that such wills remain contestable except as to signature requirements. If contested, their validity turns upon the same standards applicable to wills that are not self-proving.
When a witness signs a self-proving clause, he provides in summary form the information he would be asked to furnish in detail if called to testify about a will offered for formal probate. The self-proving clause set forth in I.C. § 15-2-504(a) contains the following declaration:
We, ____, ____, the witnesses, sign our names to this instrument, being first duly sworn, and do hereby declare to the undersigned authority that the testator signs and executes this instrument as his last will and that he signs it willingly (or willingly directs another to sign for him), and that each of us, in the presence and hearing of the testator, hereby signs this will as witness to the testator's signing, and that to the best of his knowledge the testator is eighteen (18) years of age or older, of sound mind, and under no constraint or undue influence.
This language evokes our interest for two reasons. First, it embodies an even broader, more traditional "presence" requirement than I.C. § 15-2-502 contains. The drafters may have deemed it appropriate to maximize the in-person contacts between a testator and witnesses whose perceptions of the execution process would be expressed by a written declaration in lieu of subsequent testimony. In any event, the language of this declaration undermines any argument that the drafters of the U.P.C. intended to abolish the "presence" requirement entirely. The second interesting feature of section 2-504 is that it clearly contemplates that the witnesses will perform an observatory function. They are expected to derive some impression concerning the testator's state of mind and the existence of any apparent constraint or undue influence. Such impressions may be imperfect, but they serve a cautionary purpose which would be utterly lost if there were no in-person contact at all between the testator and the witnesses.

C
When interpreting an Idaho statute, we also consider the decisions of courts in other jurisdictions where statutes containing similar language have been construed. Unfortunately, there is a paucity of such cases presenting the precise issue before us today. The cases cited to us, holding that acknowledgments may not be given by telephone where the governing statutes specifically mention physical presence, are not apposite to the instant case.[3] Neither do we find instructive the cases cited where telephonic acknowledgments have been upheld, but in which the telephone contacts have been supplemented by timely in-person contacts.[4] The parties have not cited, and our research has not disclosed, any reported case arising under the U.P.C. where a telephonic acknowledgment by the testator  unaccompanied by any timely in-person *1001 contacts between the testator and the witnesses  has been considered.
However, several non-U.P.C. cases offer some guidance. The verb "witnessed" has been construed by the Iowa Supreme Court. The case of In re Pike's Will, 221 Iowa 1102, 267 N.W. 680 (1936), arose when a testatrix asked a potential witness to sign her will. The testatrix did not have the will with her at the time. Approximately two weeks later, a friend of the testatrix brought the will to the witness. The witness signed and, about a month thereafter, the testatrix thanked the witness for doing so. The Iowa Supreme Court held that the will had not been "witnessed" as required by the statute.[5] The Court explained that the testatrix had not signed the will; neither had she, by her words or conduct, adopted the will as hers in the presence of the witness. Consequently, the witness lacked first-hand knowledge that the testatrix had signed the will  an indispensable element of witnessing.
The Iowa Supreme Court reaffirmed this holding when it decided In re MacVicar's Estate, 251 Iowa 1139, 104 N.W.2d 594 (1960). There, the Court again said that to witness a will a person must actually observe the execution or an acknowledgment of the instrument. See also Wood v. Davis, 161 Ga. 690, 131 S.E. 885 (1926) (holding that attesting witnesses must see the testator either sign the instrument or acknowledge his signature, expressly or impliedly).
A New York case, In re Will of Heaney, supra note 3, presented the related question of whether a will could be acknowledged by telephone. The governing statute then provided: "The testator may either sign in the presence of, or acknowledge his signature to, each attesting witness separately." N.Y. Est. Powers & Trusts § 3-2.1(a)(2), as reported in 347 N.Y.S.2d at 923. The New York appellate court held that a telephonic communication would not satisfy the requirement that the testator "acknowledge his signature to" each witness.

D
Although not specifically argued by the appellants here, we recognize that the literature contains an alternative view of will execution formalities. This view, primarily advocated by Professor John H. Langbein of the University of Chicago Law School, is based on the substantial compliance doctrine. Professor Langbein argues that courts liberally should validate wills if they appear to reflect testamentary intent even though they were not executed in strict compliance with statutory requirements. See, e.g., Langbein, Substantial Compliance with the Wills Act, 88 HARV.L.REV. 489 (1975) (hereinafter Substantial Compliance). Professor Langbein's thesis is that if execution requirements for wills are too burdensome, ordinary citizens may die intestate or may attempt to pass property by nonprobate mechanisms rather than by testamentary means. This thesis, broadly stated, is unassailable. But it appears that Professor Langbein's principal concerns are directed at mechanical and excessively technical "presence" requirements. Among them are the presence of one witness when the other signs and the presence of the testator when both witnesses sign. These have been abolished by the U.P.C.
Some foreign jurisdictions, such as South Australia, have adopted versions of the substantial compliance doctrine so sweeping that they appear to validate wills executed without any in-person contact between testators and witnesses. See generally Langbein, Crumbling of the Wills Act: Australians Point the Way, 65 A.B.A.J. 1192 (1979). But the U.P.C. stops short of authorizing such a practice. As noted by the New Jersey Supreme Court:
The Code's approach was not to encourage courts to abandon their strict construction *1002 of the formalities prescribed, but rather to reduce the number and refine the scope of those formalities so that, if strict construction were employed, "inequities" in individual cases would occur less frequently and would be justified by the importance of the interests protected by the formal requirements that were retained.
Estate of Peters, supra, 526 A.2d at 1009.
Langbein has suggested that the U.P.C. would allow telephonic acknowledgment of a will to witnesses who had no other contact with the testator. Substantial Compliance at 511. We have found no case so holding. Langbein simply cites another law review article for this proposition. See Kossow, Probate Law and the Uniform Code: "One for the Money ...", 61 GEO. L.J. 1357 (1973). However, the article merely observes that the Code does not specifically define the term "witnessed" as used in section 2-502. As a result, the author says, telephonic communication "conceivably" could be held to comply with the Code. However, the author goes on to criticize such a result:
If this is correct, the possibility of fraud or substitution of the wrong document would render unreliable the document being offered for probate. In this same context, the Code would negate the basic policy of the Statute of Frauds... . It would be preferable to require that the witnessing of the testator's signature, or the testator's acknowledgment of the signature or of the will itself[,] be done in the testator's conscious presence.
Id. at 1380. Our analysis today is consistent with this admonition.

E
In summary, we have examined the plain language of I.C. § 15-2-502. We have explored the history of U.P.C. section 2-502. We have discussed the functions of witnesses, as illustrated by section 2-504, and we have consulted cases interpreting terms later employed in section 2-502. Finally, we have considered the thrust and the limitations of the substantial compliance doctrine. Based on all of the foregoing, we hold that I.C. § 15-2-502 preserves the observatory function as well as the signatory function of witnesses. In order for a will to be validly executed, each witness must have observed the testator sign the will, or must have observed the testator's acknowledgment of his signature or of the will. Accordingly, a telephonic acknowledgment by the testator, without more, will not suffice.[6]
Here, the "Rood will" was signed by two people who never observed any act by the testator. The only personal communication was by telephone after the will had been fully signed. This does not satisfy the execution requirements of I.C. § 15-2-502. We conclude that the district court ruled correctly in overturning the magistrate's decision to admit the "Rood will." In light of this conclusion, we need not decide whether the provisions of that will were properly construed.

III
Charles Scoggin, the party successfully challenging the validity of the "Rood will," has urged in his cross-appeal that the district court should have ruled on the admissibility of the prior will he offered for probate, instead of remanding the case for a determination on that question. Citing Pope v. Intermountain Gas Co., 103 Idaho 217, 646 P.2d 988 (1982), Scoggin argues that the facts bearing on the validity of the prior will are uncontested and that the record yields an obvious answer to the question of whether the will should be admitted.
However, our review of the record leaves us in doubt as to whether admissibility of the "Scoggin will" was an issue squarely joined and thoroughly aired in the magistrate division. The parties appear to have focused their attention on issues relating to the validity and construction of the "Rood will." The magistrate found it unnecessary *1003 even to consider the admissibility of the "Scoggin will." Accordingly, we think this case bears less resemblance to Pope than to Golden Condor, Inc. v. Bell, 106 Idaho 280, 678 P.2d 72, (Ct.App. 1984). There, as here, the parties devoted primary attention at trial to issues other than the question that eventually became dispositive in light of a decision on appeal. We observed that in such circumstances, "an appellate court's authority to by-pass a remand and to direct a final judgment must be exercised cautiously. It should not be employed where justice may require further proceedings." Id. at 287-88, 678 P.2d at 79-80. We think similar caution is appropriate here. Accordingly, we sustain the district court in remanding the case for determination of whether the prior will should be admitted to probate.
The decision of the district court is affirmed in its entirety. Because no party has wholly prevailed on appeal, we award no costs or attorney fees.
SWANSTROM, J., concurs.
OLIVER, J., pro tem, dissents without opinion.
NOTES
[1] During our research into the evolution of U.P.C. § 2-502, we obtained microfiche copies of the minutes of the Commissioners on Uniform State Laws relating to the U.P.C. These materials have been made part of the microfiche collection at the Idaho State Law Library.
[2] We caution readers that loose language occasionally can be found in the literature, referring to abandonment of a "presence" requirement by the Uniform Probate Code. Upon close examination, we have found that such references relate to particular aspects of the "presence" requirement that the U.P.C. drafters found to be excessive. These include the presence of one witness when the other signs or the presence of the testator when both witnesses sign.
[3] See, e.g., Myers v. Eby, 33 Idaho 266, 193 P. 77 (1920); In re Estate of Jefferson, 349 So.2d 1032 (Miss. 1977); In re Will of Heaney, 75 Misc.2d 732, 347 N.Y.S.2d 922 (Surr.Ct. 1973).
[4] See, e.g., Banning v. Banning, 80 Cal. 271, 22 P. 210 (1889); In re Gray's Estate, 75 Cal. App.2d 386, 171 P.2d 113 (1946).
[5] The Iowa will execution statute then provided as follows: "All other wills, to be valid, must be in writing, signed by the testator, or by some person in his presence and by his express direction writing his name thereto, and witnessed by two competent persons." (Emphasis added.) The statute since has been modified to make the "presence" requirement more explicit, in conformity with court decisions. See Iowa Code Ann. § 633.279.
[6] For similar reasons, we also reject the argument that an acknowledgment may be made indirectly through a purported agent without any in-person contact between the testator and the witnesses.