746 P.2d 85

**In the Matter of the ESTATE OF Edward Reese McGURRIN, Deceased.**

**Heidi McGURRIN & Flicka McGurrin, Appellants–Cross Respondents,**

v.

**Charles O. SCOGGIN, Respondent–Cross–Appellant.**

**In the Matter of the ESTATE OF Edward Reese McGURRIN, Deceased.**

**Avery FLOYD and Cindy Rood, Appellants,**

v.

**Heidi McGURRIN, Flicka McGurrin and Charles O. Scoggin, Respondents.**

**Nos. 15841, 15868.**

Supreme Court of Idaho.

Nov. 20, 1987.

### ORDER DENYING PETITIONS FOR REVIEW

A PETITION FOR REVIEW and supporting BRIEF having been filed October 10, 1986 by Appellants Floyd and Rood of the Opinion issued September 25, 1986; Appellants McGurrins having filed a JOINDER IN PETITION FOR REVIEW on October 16, 1986; the Court of Appeals having subsequently filed an Opinion on September 9, 1987, 113 Idaho 341, 743 P.2d 994, which withdrew the prior Opinion issued September 25, 1986; a PETITION FOR REVIEW BY SUPREME COURT having been filed by Appellants McGurrin and supporting MEMORANDUM on September 28, 1987; the Court being fully advised; therefore, good cause appearing,

IT IS HEREBY ORDERED that the PETITIONS FOR REVIEW filed by Appellants Floyd and Rood and McGurrin be, and they hereby are, DENIED and the Dissent on Denial by Bistline, J. be, and hereby is, RELEASED.

BISTLINE, Justice, dissenting on Denial of Petition for Review.

Without doubt the easiest course would be to quietly abide with the Court's decision to deny the petition for review of the decision of the Court of Appeals; but to do so would be an abdication of the responsibility of this office. The petition should be granted, for a number of reasons, one of which is that the appeal, once it was taken to this Court, should not have been assigned to the Court of Appeals, being that it is a matter of first impression which as well involves the development of the law. I.A.R. 108. That it is so is readily observed on reading the opinion of the Court of Appeals. The assignment process is controlled by one justice; that justice reviews the record and the briefs, and as he determines the appeal is retained in this Court, or it is assigned. Although I have labored under the belief that the parties, or either of them, could petition the Court to recall an appeal from the Court of Appeals, any such rule in the book of Rules, and particularly the Appellate Rules, escapes me.

It is readily understood why this particular case was assigned to the Court of Appeals. The primary issue which the Court of Appeals had to decide was the validity of the "Rood" will; the challenge to that will was made by Charles O. Scoggin, the proponent for the "Scoggin" will, which if admitted to probate would leave all of the decedent's estate to him. The estate is substantial. Charles O. Scoggin is not otherwise identified than by name in the Court of Appeals opinion. When he retired from the office of district judge of the Fifth Judicial District in 1975, after 18 years of service, he was that well respected by the members of this Court that he soon became the "sixth justice" of this Court by reason of generally being called upon to sit with the Court whenever one of the court membership was unavailable. Putting aside any Per Curiam opinions in cases in which Judge Scoggin participated, a quick run through of volumes 96, 97, and 98 of the Idaho Reports shows that he was indeed the Court's sixth justice, having participated in the opinions not less than 78 times, and was author of the opinion for the Court

not less than 7 times, including such notable opinions as *Estate of Freeburn,* 97 Idaho 845, 555 P.2d 385 (1976); *Smith v. Great Basin Grain Co.,* 98 Idaho 266, 561 P.2d 1299 (1977); *Whitworth v. Krueger,* 98 Idaho 65, 558 P.2d 1026 (1978); and *Skelton v. Spencer,* 98 Idaho 417, 565 P.2d 1374 (1977).

In May of 1976, at the time of my joining the Court, at an appropriate ceremony Judge Scoggin was honored for his generous participation on the Court up to that time, and, of course, he continued thereafter, perhaps into Volume 99, which I have not perused. A justice who sat on this Court many years ago aptly wrote that service on an appellate court brings an association which is extremely close. It would have been very unlikely that any of us who have known Judge Scoggin would have felt comfortable sitting on an appellate case where he is directly involved. This is because of individual feelings. As five justices comprising a court, however, and that being the state's highest appellate court, this Court should have retained the appeal, even though without doubt at least four of us would have stepped out of the picture, perhaps all five. The Court would still continue to function, as courts always do, and no matter which district judges or Court of Appeals judges filled the empty seats, the Court would still be the Supreme Court of Idaho. Such things occasionally do happen, and happen they must when the unusual situation presents itself. On an occasion some seven or more years ago, Judge Scoggin recused himself from sitting in a case where the record clearly indicated that it was an appeal in a damage action, wherein my client had prevailed before my ascending to the bench and where I yet retained a contingent interest therein.

Assuming the validity of the foregoing surmise, I repeat that it is easily understood why the justice in charge of the assignments would have sent this case to the Court of Appeals. While I can sympathize, because the Court is the Court, I question the wisdom of the decision.[1]

Now, almost three years later, the case is again before this Court on a petition for review. If there be any sentiment that individually again we will not participate, yet the Court—albeit down to a complement of four justices—is still the Court. To turn down the review is, however the strongest form of participation. It is the absolute finale for the appellants in state court litigation. My contention is that review of the important question should be granted. Those of us who feel disqualified from further participation can step aside, and let others step in. To deny review, if it is being denied by a court whose membership would not sit in judgment on the merits, is tantamount to a denial of both state and federal notions of due process.

Moreover, there is taking place at the same time a denial of procedural due process. It is a rule of the Court—one not published in the Idaho Appellate Rules— that three votes are required to grant a review. Three votes are not easily gained out of a five member court. To obtain three votes out of a four member court results in even greater odds against the petitioner. As stated above, we are down to a complement of four by reason of the untimely death of Justice Donaldson. Notwithstanding that the machinery is in place to assign a district judge, acting or retired, to participate in deliberations on the granting or denying of the petition for review, my request that it be done has gone for naught. Admittedly, if there are three votes against granting the petition, another justice pro tem, should he vote with me, would not change the outcome. But, there is always the thought that those who are unimpressed with this humble public servant's assessment of the situation, might become changed by the views of someone more versed in the art of persuasion. That person is kept out, which clearly works a denial of procedural due process. The litigants are entitled to lay their petition for review before a court comprised of five members. A complete failure of procedur-

1. Not only do I fail to find anything in the I.A.R. which affords the attorneys an opportunity to challenge an assignment, I see nothing in the Court's internal rules which serves to advise the non-involved members as to what has been done in that regard.

al due process emanates from this Court today.

Someone more eloquent than I might state far better that this is a prima facie case for the granting of review. Quickly, the history of the case is this: The trial court, Judge Burdick, upheld the validity of the will. The appellate district court, however, ruled the will out. The three-judge Court of Appeals upheld the district court—but by the narrowest of margins, a two-one decision. The Court of Appeals opinion was issued over a year ago, September 25, 1986. A petition for rehearing was granted, and that court labored for almost another full year until it acted— withdrawing its 1986 opinion, and issuing in its place a substitute under date of September 9, 1987.

Speaking only for myself, which is all that any of us can do, when presented with a petition for review it becomes necessary to closely study the Court of Appeals opinion, doing so in relation to the supporting brief. A first concern is whether the opinion is unanimous, a factor to be taken into consideration and which cannot be ignored. Here it is not. The dissenting vote is that of the Honorable Arthur M. Oliver,[2] a retired district judge with almost 22 years of trials behind him, in short an experienced and highly respected jurist, who also serves as a justice pro tem on this Court and in the Court of Appeals.

When the appetite for more information is whetted, there is available the briefing which was submitted to the Court of Appeals, before that to the appellate district judge, and before that to the judge who presided at the trial level. And, we have access to the entire record.

The Court of Appeals discusses the single issue presented, i.e., under the provisions of I.C. § 15–2–502, must its witnessing requirement be an "observatory function performed by witnesses" (113 Idaho at 345, 743 P.2d at 998), or, otherwise put, is

there a "presence requirement," or, otherwise put, did the drafters of the legislation deem "it appropriate to maximize the in-person contacts between a testator and witnesses ..." in (113 Idaho at 347, 743 P.2d at 1000).

A large amount of support of this "observatory function" approach, including the quote last above set forth, is derived from the language of another statute, I.C. 15–2–504, which authorizes self-proving wills and prescribes the content of self-proving attestation clauses. Neither of the two statutes make reference to the other, and most obviously, do not impact on each other any more than the provisions of § 15–2–503 which allows for holographic wills.

What the Court of Appeals opinion does, simmered down to its essence, is require "in person contact," in the "observable presence" of a testator. The result achieved by the opinion would necessarily be the same had Edward McGurrin been totally blind and had he acknowledged his executed will to the two witnesses in his hospital room. Under the "excessively technical 'presence' requirements" (at 348, 743 P.2d at 1001) laid down by the Court of Appeals there would have been no eye-to-eye contact between the witnesses and Edward McGurrin, and hence in the view of the Court of Appeals no fulfillment of any "presence" requirement. The Supreme Court of Oregon was presented with a similar situation in pre-Uniform Probate Code days, over 50 years ago, at which time "presence" was spelled out by a positive statutory requirement much as Idaho's pre-U.P.C. statutes. That court held, as to what constitutes presence:

> But we do not believe that sight is the only test of presence. We are convinced that *any of the senses* that a testator possesses, which enable him to know whether another is near at hand and what he is doing, may be employed by

*Maynard,* 112 Idaho 312, 732 P.2d 281 (1987), for the purpose of receiving evidence, making Findings of Fact and Conclusions of Law, and entering a recommendation to the Court. 112 Idaho at 313, 732 P.2d at 282.

---

**2.** Judge Oliver sat in the place and stead of Chief Judge Walters who recused himself. A not unlikely surmise is that he felt comfortable in doing so because about that time Judge Walters and Judge Scoggins were working together on the Panel of Masters appointed in *Crooks v.*

him in determining whether the attesters are in his presence as they sign his will. Had George been suddenly stricken blind instead of having become afflicted with an abdominal illness, the circumstances determining whether the attestation took place in his presence would have been no different. It is unnecessary, we believe, that the attestation and execution occur in the same room. And, as just stated, *it is unnecessary that the attesters be within the range of vision of the testator* when they sign. *If they* are so near at hand that they *are within the range of any of his senses, so that he knows what is going on, the requirement has been met.*

[4] At least one of the objects of the statute was served in the present instance; that is, two disinterested persons were brought to the testator's bedside to be present while he executed his will. *When two disinterested persons, who later tell the truth, are present, the testator has been afforded,* in our opinion, *the best protection against fraud that this statute is capable of yielding.* In re Demaris' Estate, 166 Or. 36, 110 P.2d 571, at 585 (1941) (emphasis added).

With that case in mind, and specifically the caveat of the final sentence quoted which observes the purposes to be served by statutes regulating the validity of wills, it is in order to note that nowhere in the Court of Appeals opinion is there the slightest intimation that the language being by it written into the U.P.C. is necessarily done to prevent the perpetration of a fraud. Of the many briefs available to us, the most succinct and factually demonstrative is that filed on behalf of the nieces in proceedings before Judge Burdick:

Edward R. McGurrin was an ingeminate drafter of wills, having directed no less than nine known wills prior to his death on April 18, 1983. Of those many wills, only two (2) competing wills have been proposed for probate and are relevant herein: (1) will dated July 24, 1981 —hereinafter "Scoggin" will; (2) will dated December 19, 1982—hereinafter "Rood" will.

McGurrin's heirs, Heidi and Flicka McGurrin, have moved this court for an order granting partial summary judgment and ask that the court declare as a matter of law that:

(1) The Scoggin will is *not* entitled to probate because it was revoked by the subsequently drafted Rood will by inconsistency;

(2) The Rood will *is entitled* to probate because it meets all statutory requirements of the present Idaho probate code and is the last will of the testator; and

(3) Edward R. McGurrin died partially intestate and his heirs-at-law are entitled to an equal share in that two-fifth (⅖) portion of the estate which does not pass by testate succession under the Rood will.

## STATEMENT OF FACTS

On July 24, 1981, the decedent, Edward R. McGurrin, directed Mary Schmitt of Gooding, Idaho, to draft a will. Mrs. Schmitt was a law partner of retired former District Judge Charles Scoggin. At the time this will was drafted, and at the present time, Judge Scoggin was practicing law in Gooding, Idaho sharing office space with Mrs. Schmitt and utilizing her office facilities and office personnel in exchange for legal services that Scoggin provided to Schmitt. The July 24, 1981 will (Scoggin will) left the entirety of McGurrin's estate to Judge Scoggin. Although the above circumstances might otherwise create a variety of legal questions concerning the propriety of the Scoggin will, for purposes of McGurrin's motion for partial summary judgment it will be presumed that the Scoggin will is completely valid, because despite its validity and/or its invalidity it must fail by virtue of the subsequently drafted Rood will that revokes the Scoggin will be inconsistent. The Rood will was dictated, prepared, typed and drafted on December 19, 1982, (1½ years *after* the Scoggin will). At the time the Rood will was prepared, Edward R. McGurrin was a patient at St. Benedict's Hospital in Jerome, Idaho. McGur-

rin personally dictated the terms and format of the will to his secretary, Cindy Rood. McGurrin was hospitalized for a minor case of pneumonia, and on December 19, 1982, shortly before being released from the hospital, he directed his secretary to write, in long hand, the terms of:

*My Very Last Will and Testament*
*Edward Reese McGurrin*

McGurrin personally chose the wording and format of the Rood will and instructed his secretary on how to caption the document, the format for the testator's signature and for the two attesting witnesses and all other portions of his will, as his "secretary" was a student at Jerome High School, was untrained and unfamiliar in these matters. After he dictated his will, McGurrin read the secretary's long-hand notes (Exhibit "A"), made a few minor changes, and directed his secretary to go home and type out the will verbatim. After the will was typed, it was returned to McGurrin at his hospital room and apparently was signed by McGurrin either that day, December 19, 1982, or on the following morning, December 20, 1982. No one saw McGurrin sign, but everyone acknowledges that his signature is properly subscribed and that his signature is genuine and authentic.

On December 20, 1982, McGurrin asked his secretary to return and directed her to take the will to Cindy Rood's home to have her mother and sister sign as witnesses to the will. McGurrin was acquainted with Cindy Rood's mother, Menerva Rood, and Cindy Rood's sister, Velda Rood, and specifically directed that these two persons sign as witnesses to McGurrin's will. Menerva and Velda Rood are both older than 18 years of age, and otherwise meet all requirements of *Idaho Code* § 15-2-505.

Pursuant to her employer's specific request and instruction, Cindy Rood took the will home and when her sister returned home from work, McGurrin's sec-

retary explained to both Menerva and Velda Rood that Mr. McGurrin had asked that they sign and witness his will. The will was read by both Menerva and Velda Rood and both understood that the document with Edward McGurrin's signature affixed was his last will and testament. After reading the will, both witnesses, in the presence of one another and in the presence and at the request of Cindy Rood signed the will as witnesses as requested.

Cindy Rood next returned the attested will to her employer. McGurrin then requested that his secretary place a call to Menerva and Velda Rood.

The Roods' residence is equipped with two telephones whereby two different people may participate in the same telephone conversation at the same time. Pursuant to her employer's direction, Cindy Rood called the Rood residence, explaining that McGurrin wanted to speak to both Menerva and Velda at the same time. McGurrin then got on the telephone, identified himself to both Menerva and Velda and while both individuals were on the same telephone line at the same time, stated that he wanted to

thank them for having signed and *witnessed his will*. It has been a big help.

The testimony of the witnesses, Cindy Rood, Velda Rood, and Menerva Rood, was not challenged; it appears to clearly show that the testator acknowledged that the will document to which Velda and Menerva signed their names was his will.[3] The word "acknowledged" as used in the statute does not suggest the involvement of a notary public or other officers who are authorized to take acknowledgments on deeds, mortgages, etc. Nothing which has been written on the subject suggests other than that the word is used in its ordinary meaning; generally, recognized or given recognition, take notice of.

The Court of Appeals' opinion (113 Idaho at 345, 743 P.2d at 998) after mentioning the dropping of the "signed by the witnesses in the presence of the testator," in the

---

**3.** That testimony is attached as Appendix A.

next paragraph states that the dropping of that language "manifested no intent to discontinue the in-person contact requirement entirely," and then on p. 346, 743 P.2d at 999 adds that "There was no suggestion that the in-person contact requirement had been wholly abandoned." This statement is not challenged. But, it can equally be said that the drafters manifested no intent to continue such in-person contacts and no suggestion that such were not abandoned. Such "in person contact" language was not used. Part of a quotation, at 346, 743 P.2d at 999, from the official comment to § 2–502 strongly suggests that the latter supposition is the better one:

> There is no requirement that the testator publish the document as his will or that he request the witnesses to sign, or that the witnesses sign in the presence of the testator or of each other. *The testator may sign the will outside the presence of the witnesses if he later acknowledges to the witnesses that the signature is his or that the document is his will, and they sign as witnesses....* The intent is to validate wills which meet the minimal formalities of the statute.

In sum, on a solitary review of the Court of Appeals opinion, and having no benefit of any views other than those set out by the three courts who have considered the case, I am persuaded that there are substantial grounds for granting review. Were a review to be granted, then the review would not be of the Court of Appeals opinion, but of the appellate district court opinion and the trial court's memorandum opinion.[4] The latter is not as comprehensive as the former—but at the same time does not concern itself with case-law which is from other states and a large portion of which is pre-Uniform Probate Code.

Judge Hurlbutt on appellate review of the magistrate's decision opened his own opinion thusly:

The facts and circumstances surrounding the preparation and execution of the Rood will are not in dispute, leaving for resolution here the legal question of whether those facts and circumstances meet the appropriate statutory requirements for valid execution. R., p. 273.

His view of the effect of the Uniform Probate Code was that if the witnesses "witness the testator's acknowledgment of the will, the code properly removes the 'presence' requirement of the witness," citing *Parkison v. Artley*, 93 Idaho 66, 455 P.2d 310 (1969), but then goes on to say that "... neither the code nor the cited case law permits the acknowledgment of the will to be out of the presence of the testator. R., p. 277. *Parkison, was a pre-Uniform Probate Code case.* The witnesses were not present when the seriously ill and hospitalized testator signed his will. The question presented was the validity of a subsequent acknowledgment of the document as his will. The language of the opinion is appropriate to this case:

> *Under our statute, it is not required that the will be signed in the presence of the attesting witnesses.* However, if the document is not signed before the witnesses, the testator must acknowledge the signature as his or as having been made by his authority. * * *
>
> *    *    *    *    *    *

The next question then, is whether what transpired in Clinton Reeves' hospital room, after Mrs. Kleint arrived, was a sufficient acknowledgment. *The general and better reasoned rule appears to be:*

> *The testator may acknowledge his signature by his acts and gestures, without making any express acknowledgment of the signature in words. If, without referring to such instrument as his will, the testator produces it with his signature visible and requests witness [sic] to sign it, this is a sufficient acknowledgment.* 2 Bowe-

4. I concede some uncertainty as to knowing under the rules where deference will be reposed, and have made a run-through of the district court opinion on the basis that the Court of Appeals has also done so, "a thorough and

well-reasoned decision" 113 Idaho at 343, 743 P.2d at 996). Judge Hurlbutt concluded that the question is on the law only, there being no conflicting or disputed evidence.

Parker: Page on Wills § 19.115 (1960). See also 57 Am.Jur., Wills, § 198 (1948) and 7 A.L.R.3d 317, 353 (1966). When, as here, a testator produces a document constituting a testamentary disposition of his property, with what purports to be his signature clearly visible thereon and asks that it be signed or witnessed by the persons present, there has been sufficient acknowledgment of his signature in the absence of any question of fraud or undue influence.

We are also convinced, in view of all the circumstances, that there was a sufficient publication of his will by the testator. In the case of *Estate of Gordon*, 48 Idaho 171, at page 174, 279 P. 625, at page 626 (1929), this court said:

*The statute requires that, at the time of subscribing or acknowledging the same, the testator must declare to the attesting witnesses that the instrument is his will. While this requirement must be complied with, no particular formula of words or actions, is prescribed to constitute the required declaration. It may be done, of course, by word of mouth, but an examination of the numerous decisions is convincing that it may also be inferred from the acts and conduct of the testator.* [citations] (Emphasis added).

The court concluded that the acts of calling in a nurse, pointing to the document and asking her to sign was a sufficient "acknowledgement" despite the then acting requirements of the old Idaho Probate Code, noting as follows:

We conclude that under the circumstances of this case, a declaration by the testator that this was his last will and testament may be "inferred from the acts and conduct of the testator." *Ibid.*, 93 Idaho at 69, 455 P.2d 310.

The *Parkison* decision is important to note because despite the exacting requirements of the old Idaho probate code, the Idaho Supreme Court held that witnesses need not be present to see the testator sign and the acknowledgment that would be required even under the more stringent pre–1971 probate code

was merely any word, action, or gestures whereby the testator conveyed an acknowledgment that the instrument was his will.

Judge Hurlbutt said that the foregoing, and other cases, evidenced that "Every case dealing with acknowledgment of a will cited by the proponents of the Rood will show the testator and the witness coming together at some point." R., p. 277. Yet at p. 280 he stated that the legislature in enacting I.C. § 15–2–*502* "has determined that the purposes of signing by the attesting witnesses in the presence of the testator *are satisfactorily sustained if we allow the witnesses to witness only an acknowledgment of either the signature or the will.*" (Attestation is not included. § 15–2–505).

There was here such an acknowledgment; the testator and the witnesses "did come together," albeit over a telephone arranged *at the competent testator's request.* The gist of Judge Hurlbutt's decision is found in his belief that the witnesses, had no meaningful time "to observe" the testator, and consequently were "incapable of presenting any credible evidence as to whether he was under imposition, undue influence, or whether a deception, fraud, mistake or substitution was taking place." R., p. 280. Judge Hurlbutt's concerns obviously were not with the simple factual situation laid out before him in the record, but were with other cases in the future where those bothersome elements might be involved. Such concerns would be philosophical in nature and properly considered by drafters of legislation. But, having so philosophized in this case, he was able to and did rule that Mr. McGurrin's actions in getting the two signatories on the phone at the same time, and acknowledging that the document they had signed was *his* will, and thanking them for signing it, was not an acknowledgment of his will in his view of the law.

He nevertheless recognized that "Many of the technical formalities relating to the acknowledgment and attestation of a will have been long diminished." R., p. 281.

He did not provide any citation to this statement to inform whether it was in reference to the 1971 Uniform Probate Code, or to the Idaho pre-Uniform Probate Code case of *Parkison v. Artley, supra,* which was clearly a landmark case establishing this jurisdiction's liberal view as to the strict technicalities of attestation and acknowledgment. He had noted, R., p. 277, that the case "holds that acknowledgment *need not be by express words,* but can be proved by gestures and *surrounding circumstances.*" In short, Judge Hurlbutt's "coming together" requirement ruled out "coming together over the telephone," and this even though "surrounding circumstances" were a competent Mr. McGurrin, while convalescing in a hospital, going about the business of making a will, utilizing his secretary as intermediary to obtain signatures, and thereafter to arrange a three-person telephone call where he spoke to the signatories of the document which they had just signed *as his will*—which would seem to be acknowledging his will— within most definitions of acknowledge.

Judge Hurlbutt relied to a large extent upon a 1977 case from the Mississippi Supreme Court, In re Estate of Jefferson, 349 So.2d 1033, finding it "factually similar." The one similarity is that as to the *attestation* of the will, under the provisions of § 91–5–1 Mississippi Code Annotated, one of the attesting witnesses signed the will as a subscribing witness where his only contact with the testator over the telephone, and there had been no prior contact between the testator and his witnesses. In this case, however, attestation is not involved. The single issue squarely presented is: Did Edward McGurrin acknowledge to the two signatories that the will which they had signed at his transmitted request was indeed his will? A cursory examination of the Mississippi Code Annotated quickly reveals that Mississippi has not adopted the Uniform Probate Code or any version of it. Obviously under the pre-Uniform Probate Code Idaho statutes the "Rood" will might be invalid, but that is not the applicable law.

Equally inapplicable is the reliance which Judge Hurlbutt placed on *In re Michie,* a Louisiana Court of Appeals case, 183 So.2d 436 (1966) from which he quoted. The holding of that case was simply that the complete absence of an *attestation* to the will rendered it invalid. 183 So.2d at 438. Louisiana law, LSA–R.S. 9:2442(3) required an attestation clause in language much like Idaho's pre-Uniform Probate Code statutes. The *Michie* case, 1966, was decided considerably before the advent of the Uniform Probate Code in that state, and perhaps was not adopted.

In sum, this endeavor is not an appellate review in the ordinary sense. It is the type of review which is necessary to vote whether to grant review. The endeavor has been directed at making a limited review for the purpose of making a determination that the case is one which does or does not call for a Supreme Court review of the opinions below. That in turn has required examination of some of the authority relied upon by the prior courts which have passed on the issue. At a glance it is seen that identical authority has not been considered, or if considered, has been put aside. Our Idaho *Parkison* case merited no mention by the Court of Appeals, yet it is the most recent Supreme Court case on the execution of wills. The district court cited it, however. Neither the trial court nor the district court had available the 1987 New Jersey opinion which became available in mid-June of 1987, namely the *Matter of the Estate of Peters,* 107 N.J. 263, 526 A.2d 1005. It is the source of the "observatory" and "signatory" functions language (113 Idaho at 343, 743 P.2d at 996). The novel approach utilizing this concept was borrowed by the New Jersey court from the work of a New Jersey author, A. Clapp, New Jersey Practice, Wills and Administration (3rd ed. 1982). The Court of Appeals opinion points out, but does not highlight, that the New Jersey court very likely is a strict construction state, and quotes from its opinion language to that effect:

> The Code's approach was not to encourage courts to abandon their *strict construction* of the formalities prescribed, but rather to reduce the number and refine the scope of those formalities so

that, if strict construction were employed, "inequities" in individual cases would occur less frequently and would be justified by the importance of the interests protected by the formal requirements that were retained.

The New Jersey court then proceeded to acknowledge that the continuation of a strict construction relative to the Code-retained formal requirements was not a universal doctrine, and, in doing so acknowledged the substantial compliance doctrine advocated by Professor Langbein, quoting from his work:

> [w]hereas the argument [for substantial compliance] is for a rule of reduced formalism in enforcing whatever formalities the Wills Act requires, the UPC approach is to reduce the number of required formalities. Although both techniques work generally in the same direction, they will produce different results in many cases *if the UPC's 'minimal formalities' are to be enforced with the same literalism as before.* [*Id.* at 512]

The New Jersey court opted for the strict construction, a *literal compliance* with the statutory requirements. But, while so doing, it did NOT require the signatures of the witnesses contemporaneously with the signing by the testator, but allowed that the witnesses could sign "within a reasonable period of time following the testator's execution or acknowledgement of the will." 526 A.2d at 1011. The *holding* of the opinion was that an eighteen month interval, which was also three months after the testator's death was too long to be valid.

And, of much and singular importance, that court added, by footnote 4, at page 1014, "We are unwilling to foreclose consideration of the substantial compliance doctrine *in a case where there is no question* of fraud, *and where*, unlike this case, *there has been a clear attempt to comply with a statutory formality* but compliance is deficient." How applicable to the McGurrin will!

Idaho appears to be committed to the substantial compliance doctrine since *Parkison*, supra, and the 1929 case of Estate of Gordon quoted in *Parkison.* If so, the Court of Appeals may be seen as taking the lead in abandoning that doctrine in favor of strict construction.

My vote is the sole vote for review.

## APPENDIX A

CINDY ROOD DEPOSITION:

Q. What conversation did you have with your mother when you got home?

A. I told her that Ed has requested that she sign his—witness his will.

Q. And did she do so?

A. Not until my sister got home.

Q. Is there some reason that she waited until your sister got home?

A. I don't know.

Q. Did you tell her to wait until your sister got home?

A. No.

Q. When did your sister arrive home?

A. About 7:30.

Q. Did you have some conversation with your sister and your mother at that time?

A. Just that Ed wanted them to witness his will.

Deposition of Cindy Rood, p. 38, LL. 7–24.

Q. How long after you got home did Ed McGurrin call your mother and your sister?

A. He called them when I was at the hospital.

Q. While you were at the hospital?

A. Yes. I put the call through. I told Mom that Ed wanted to talk to her with Velda on the other end, because we have two phones, so she did that and he thanked them for witnessing his will.

Q. What did he say to them, the exact words, as you can best recall?

A. He said, "I'd like to thank you for being a witness on my will. It's been a big help."

Deposition of Cindy Rood, p. 45, LL. 11–22.

Q. What did you say to your mother?

A. "Mom, Ed wants to thank you and Velda for witnessing his will. Put Velda on the other end."

Deposition of Cindy Rood, p. 46, LL. 3–7.

Q. Did you have any discussion at that time about the terms or conditions of this will?

A. No.

Q. He simply told you that this was his will, that he had signed it, take it home and have your sister and mother witness it?

A. Yes.

Q. And you returned back to the hospital on Monday, December 20th at approximately what time?

A. After I took this home?

Q. Yes.

A. Probably about 8:00.

Q. And then you placed a call to your mother?

A. Yeah.

Q. And she and your sister got on the line and had a discussion with Mr. McGurrin?

A. Yes.

Q. During that discussion, did he acknowledge this to be his will?

A. Yes.

Q. And he said what about this document, Deposition Exhibit No. 2, during that discussion?

A. Just that he would like to thank them for witnessing it.

Q. Witnessing it. Did he use the word "will" when he talked to them?

A. Yes.

Q. Tell me as best you remember what he said that you heard?

A. He said, "I would like to thank both of you for witnessing my will and it's been a great help."

Q. And at that time, to the best of your knowledge, both your mother and your sister were on the phone?

A. Yes.

Deposition of Velda Rood, p. 66, L. 5 through p. 67, L. 14.

Q. Did you ever talk to him at any other time that you can recall?

A. When he asked us to sign his will.

Q. Did he ask you to sign it?

A. Well, he thanked us for signing it.

Deposition of Velda Rood, p. 7, LL. 21–25.

Q. Tell me from the first time you put that receiver to your ear what you heard and what you said?

A. I heard Mr. McGurrin's voice.

Q. Did you identify yourself first?

A. Yes.

Q. What I'm getting at is how did he know you were on the phone?

A. I said, "Hello, this is Velda."

Q. What did he say?

A. He said hi.

Q. What else did he say?

A. He said, "Thank you for signing or witnessing my will."

Q. What did you say?

A. I says, "You're welcome."

Deposition of Velda Rood, p. 16, L. 23, p. 17, L. 14.

Q. You recognized Mr. McGurrin's voice when you were talking to him on December 20th?

A. Yes.

Q. You have no doubt that it was Mr. McGurrin who said, "Thank you for signing my will?"

A. No doubt.

Q. When you signed the original of the document that appears like Deposition Exhibit No. 2, you knew that you were signing Mr. McGurrin's will?

A. Yes.

Q. And you'd been directed to do so by Cindy on his behalf?

A. Yes.

Deposition of Velda Rood, p. 18, LL. 11–23.

Q. What do you recall that he specifically said to you when you were on the phone?

A. He just said, "Thank you for signing my will."

Q. Anything else?

A. Not that I remember.

Deposition of Menerva Rood, p. 10, LL. 9–14.

Q. And that's all he said is "thank you for witnessing my will"?

A. Yes.

Q. Did you say anything to him?

A. "You're welcome."

Q. You distinctly heard her say that?

A. Yes.

Q. Did you and Velda sign that will together?

A. Yes.

Q. Where did you do it?

A. At the kitchen table.

Q. And was Cindy present?

A. Yes.

Q. Was anybody else present at the time that you signed that will or talked to Mr. McGurrin?

A. No.

Deposition of Menerva Rood, p. 11, LL. 6–23.

Q. After you signed it, Mr. McGurrin called you and thanked you for signing the will?

A. Yes, he did.

Deposition of Menerva Rood, p. 16, LL. 13–16.

Q. When you talked to Mr. McGurrin on the phone, did you recognize his voice?

A. Yes.

Q. Did he identify himself to you?

A. I don't remember whether he identified himself, but I knew his voice. I'd talked to him several times on the phone.

Q. And he did acknowledge or at least use the words to you "thank you for having signed my will?"

A. Yes, he did.